UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

PAUL A. CLEVELAND *ET AL.*,

Plaintiffs,

No. 3:15-CV-00744-JWD-RLB

VERSUS

SHERIFF SID GAUTREAUX III *ET AL.*,

Defendants.

**ORDER AND RULING ON DEFENDANTS' MOTIONS TO DISMISS**

**I.      INTRODUCTION**

Before the Court is the Motion to Dismiss ("First MTD"), (Doc. 7), filed by two natural defendants—Sheriff Sid J. Gautreaux III ("Gautreaux"), Sheriff of East Baton Rouge Parish, and Lieutenant Colonel Dennis Grimes ("Grimes") (collectively, "Natural Defendants"),[1] Warden of East Baton Rouge Parish Prison ("EBRPP")—and the Motion to Dismiss ("Second MTD"), (Doc. 8), filed an artificial defendant—Prison Medical Services ("PMS"), a division of the City of Baton Rouge/Parish of East Baton Rouge ("City/Parish"). Mr. Paul A. Cleveland ("Cleveland"), Mr. Paris LeBlanc ("LeBlanc"), and Ms. Mindy Capello ("Capello")

---

[1] Other individuals are named in the Plaintiffs' papers. For purposes of the First MTD, however, Grimes and Gautreaux are the only relevant persons.

(collectively, "Plaintiffs") have responded to the First MTD with the Memorandum in Opposition to Motion to Dismiss ("Opposition to First MTD"), (Doc. 13), and the Second MTD with the Memorandum in Opposition to Motion to Dismiss ("Opposition to Second MTD"), (Doc. 11). Defendants supported the First MTD with the Reply Memorandum in Support of Motion to Dismiss ("Reply in Support of First MTD"), (Doc. 21), and the Reply Memorandum to Plaintiffs' Opposition to the City of Baton Rouge/Parish of East Baton Rouge's Motion to Dismiss ("Reply in Support of Second MTD"), (Doc. 26). Having reviewed the papers filed by the Natural Defendants and PMS (collectively, "Defendants") and Plaintiffs (collectively, "Parties"), related briefing, and applicable law, for the reason more fully explained below, this Court DENIES the First and Second MTDs.

## II.  BACKGROUND

### A.  RELEVANT FACTS[2]

On or about September 19, 2014, Cleveland, "who had a significant history of psychiatric illness, including diagnosis of Bi-Polar Disorder," made a threat, recanted minutes later, against a local judge in front of an employee at the Clerk's office for the First Circuit Court of Appeals in Baton Rouge. (Doc. 45 at 2; Doc. 1 at 2.) On that same day, on the basis of his explicit threat, a warrant for Cleveland's arrest issued, and Cleveland was arrested at his home in Donaldsonville, Louisiana. (Doc. 45 at 2; Doc. 1 at 2.) Booked that night into the Ascension Parish Prison, Cleveland was transferred to EBRPP on September 20, 2014. (Doc. 45 at 2; Doc. 1 at 2.) Gautreaux and Grimes allegedly served as EBRPP's "official policy makers." (Doc. 45 at

---

[2] In light of the applicable standard, *see infra* Part III.A, the factual summary herein takes as true the relevant pleadings' allegations.

2; Doc. 1 at 2.) PMS, in turn, provided medical services to EBRPP's inmates, "operat[ing] the facility . . . [therein] pursuant to a contract with . . . Gautreaux." (Doc. 45 at 3; Doc. 1 at 3.) Gautreux and Grimes, Plaintiffs claim, "were responsible for providing inmates with adequate medical treatment." (Doc. 45 at 3; Doc. 1 at 3.)

At intake, Cleveland allegedly advised prison officials of his numerous health problems, including suicidal thoughts, bipolar disorder, diabetes, high blood pressure, spinal stenosis, leg and ankle trouble, and peripheral artery disease. (Doc. 45 at 3; Doc. 1 at 3.) Later that day, LeBlanc, Cleveland's daughter, "phoned prison officials and spoke to [Ms.] Linda Ottesen ['Ottesen']," "a supervisor with the prison medical department." (Doc. 45 at 3; Doc. 1 at 3.) Allegedly, she "explained all of . . . Cleveland's medical conditions, and medications to . . . Ottesen and . . . provided the name of Cleveland's primary care physician and pharmacy." (Doc. 45 at 4; Doc. 1 at 4.)

Two days later, Cleveland spoke to his son and complained "that he was on suicide watch, had no clothes or bedding, was freezing and had not received any of his medications." (Doc. 45 at 4; Doc. 1 at 4.) Afterward, during a meeting with an EBRPP social worker, Cleveland recapped his medical history, telling of his attempted suicide, diagnosis for major depression, and fourteen prior surgeries. (Doc. 45 at 4; Doc. 1 at 4.) Of particular relevance to the present dispute, Cleveland added that he could not "get to pill call" without a wheelchair. (Doc. 45 at 4; Doc. 1 at 4.) On September 22, 2015, in a conversation with Ottesen, LeBlanc again substantiated her father's history, claiming that Cleveland had been "in mental health facilities 4 times and had tried to commit suicide twice." (Doc. 45 at 4; Doc. 1 at 4.) In these early days, however, no wheelchair was provided, and Cleveland's medical files were not requested. (Doc. 1 at 3–5; Doc. 45 at 3–5.)

On September 26, 2014, Cleveland again spoke to his daughter. (Doc. 45 at 4; Doc. 1 at 4.) According to LeBlanc, he complained of chest pains and shortness of breath and told her "that he was shackled, on suicide watch, and being denied access to his medication because he was unable to walk far enough for pill call." (Doc. 45 at 4; Doc. 1 at 4.) LeBlanc immediately called Ottesen, requesting that her father be transported to Our Lady of the Lake Hospital. (Doc. 45 at 4–5; Doc. 1 at 4.) Thereupon, Ottesen "assured her that . . . Cleveland was getting his medication and would be seen by a doctor." (Doc. 45 at 5; Doc. 1 at 4.) Despite these promises, Cleveland's family "obtained a prescription from his primary care physician for a wheelchair and provided the prescription to the prison medical department." (Doc. 45 at 5; Doc. 1 at 5.) Doctor Charles Bridges refused to honor these prescriptions, and EBRPP staff accordingly refused to accept an actual wheelchair delivered by Plaintiff's own son. (Doc. 45 at 5; Doc. 1 at 5.) In response, LeBlanc called Grimes to report her father's difficulties, but Grimes "informed . . . LeBlanc that he had no control over prison medical services and that there was nothing he could do about the situation." (Doc. 45 at 5; Doc. 1 at 5.) On October 1, 2014, Cleveland's brother called Ottesen, reiterating his family's concerns over his brother's care. (Doc. 45 at 5; Doc. 1 at 5.)

Meanwhile, during his incarceration, Cleveland repeatedly advised EBRPP officials of his complaints. From October 2 to October 5, 2014, he completed three medical request forms regarding his heart problems. (Doc. 45 at 6; Doc. 1 at 6.) On October 14, 2014, to no avail, he complained of headaches and his need for both surgery and a wheelchair. (Doc. 45 at 6; Doc. 1 at 6.) On October 16 and 17, 2014, Cleveland once more requested a wheelchair, as he could not otherwise "not get his medication." (Doc. 45 at 6; Doc. 1 at 6.) LeBlanc too echoed these concerns on October 17. (Doc. 45 at 6; Doc. 1 at 6.)

On October 19, 2014, Cleveland visited with an EBRPP nurse. (Doc. 45 at 7; Doc. 1 at 7.) Apparently, this nurse noted Cleveland's shortness of breath but did no more than place him on suicide watch due to his seemingly "bizarre and abnormal behavior." (Doc. 45 at 7; Doc. 1 at 7.) Seen by a nurse on October 20, 2014, for his chest pains, he again requested a wheelchair. (Doc. 45 at 7; Doc. 1 at 7.) Around that time, Cleveland's brother once more called to convey his family's increasing worries. (Doc. 45 at 7; Doc. 1 at 7.) On October 21, 2014, Grimes himself reached out to EBRPP's medical department, apparently questioning "why Cleveland was still in lockdown if he had been taken off of suicide watch." (Doc. 45 at 7; Doc. 1 at 7.) A "glitch in the paperwork" was blamed by the unnamed EBRPP official. (Doc. 45 at 7; Doc. 1 at 7.)

Subsequently, Cleveland's condition seemingly worsened, his complaints oft-conveyed to the employees of EBRPP and PMS. On October 22 and 23, 2014, he was seen for an emergency by a prison medical department nurse due to chest, neck, leg, and back pain. (Doc. 45 at 8; Doc. 1 at 8.) When he again asked for a wheelchair on October 28, 2014, he was instead scheduled to see a psychiatrist. (Doc. 45 at 8; Doc. 1 at 8.) Finally seen by a physician on October 29, 2014, Cleveland was subjected to an echocardiogram, and blood work was ordered. (Doc. 45 at 8; Doc. 1 at 8.) Although the echocardiogram was abnormal,[3] no medical response was forthcoming. (Doc. 45 at 8; Doc. 1 at 8.)

Then, on November 10, 2014, Cleveland endured two separate medical emergencies. (Doc. 45 at 8; Doc. 1 at 8.) Rather than provide Cleveland with treatment, EBRPP confined him to "a single cell." (Doc. 45 at 9; Doc. 1 at 9.) Later that November day, Cleveland telephoned LeBlanc and "told her he was having a heart attack"; LeBlanc then called Grimes with this

---

[3] A history of abnormal echocardiogram results can suggest pulmonary hypertension, especially in a person with a medical history like Cleveland's. *See Wurtele v. Colvin*, No. 14-cv-417-PB, 2015 U.S. Dist. LEXIS 11785, at *3, 2015 WL 5167089, at *2 (D.N.H. Aug. 19, 2015).

information. (Doc. 45 at 9; Doc. 1 at 9.) Thus, on November 11, 2014, LeBlanc spoke with one more employee of EBRPP's medical department. (Doc. 45 at 9; Doc. 1 at 9.) Though this official revealed that Cleveland's echocardiogram had been abnormal and though LeBlanc thereupon "begged" for her father's transfer to Our Lady of the Lake Regional Medical Center, Cleveland remained at EBRPP. (Doc. 45 at 9; Doc. 1 at 9.)

Sometime after Cleveland was allegedly tazed and slammed into the cell door by three defendants, on November 12, 2014, Cleveland "was found unresponsive in his cell." (Doc. 45 at 9; Doc. 1 at 9.) "He was not breathing, cold to the touch, and could not be revived." (Doc. 45 at 9; Doc. 1 at 9.) As his children tell it, he "died naked on the concrete floor in Cell 10 of Cellblock A1 of the EBRPP after being tazed during a heart attack," his physical and mental problems well known but disregarded. (Doc. 45 at 10; Doc. 1 at 8.)

Based on this alleged chain of conduct, Plaintiffs sued Defendants for sundry violations. Counts one, two, and three focus on Cleveland's general conditions of confinement ("Confinement Claim"); Count Four states "an episodic act or omission claim" ("Episodic Act Claim"); and all four arise under the Fourteenth Amendment of the United States Constitution ("Constitution") and are alleged pursuant to Section 1983 of the United States Code's forty-second title.[4] (Doc. 1 at 10–17; Doc. 45 at 10–17; Doc. 13 at 3; Doc. 1 at 10–17.) Also based on the Fourteenth Amendment, the fifth claim ("Excessive Force Claim") arises from Defendants' alleged use of excessive force when they "maliciously, sadistically and unnecessarily used a tazer on a 72 year old man who was having a heart attack." (Doc. 45 at 17–18; Doc. 1 at 17–18.) Plaintiffs' sixth claim ("ADA Claim") is based on the Americans with Disabilities Act of 1993,

---

[4] In this ruling, any and all references to "Section 1983" or "§ 1983" are to this particular statutory part of this specific title.

as amended in 2008 ("ADA"). (Doc. 45 at 18–20; Doc. 13 at 16–20.) Not presently at issue, Plaintiffs' last claim ("State Law Claim") is one for Cleveland's wrongful death and survival under state law. (Doc. 45 at 20–21.) In regard to the counts relevant to this dispute, both the Amended Complaint ("Amended Complaint") and Plaintiffs' first complaint ("Complaint" or "First Complaint") (collectively, "Complaints") are identical. (Compare Doc. at 10–20, *with* Doc. 45 at 10–20.)

## B.   PROCEDURAL HISTORY

Plaintiff filed the Complaint on November 6, 2015. (Doc. 1.) PMS submitted the Second MTD on December 2, 2015, (Doc. 7), and Gautreaux and Grimes tendered the First MTD on December 7, 2015, (Doc. 8). Plaintiff docketed Opposition to the Second MTD on December 22, 2015, (Doc. 11), and the Opposition to the First MTD on December 23, 2015, (Doc. 13). PMS countered with the Reply in Support of First MTD on January 6, 2016, (Doc. 21); Gautreaux and Grimes did so on January 13, 2016, (Doc. 26). On February 23, 2016, Plaintiffs sought leave to file an amended complaint, (Doc. 36), followed by a motion to substitute the latter filing, (Doc. 37), granted on March 1, 2016, (Doc. 40). Pursuant to this Court's order on March 10, 2016, (Doc. 43), the Amended Complaint[5] was formally entered into the record on March 10, 2016. (Doc. 45.) Thereafter, multiple defendants answered. (Docs. 52, 54–55, 57.)

---

[5] In general, an amended complaint supersedes the original complaint, replacing it in full and rendering it without legal effect. *Wilson v. First Houston Inv. Corp.*, 566 F.2d 1235, 1238 (5th Cir. 1978); *accord, e.g.*, *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 927 (9th Cir. 2012); *see also, e.g.*, *Boquet v. Belanger*, No. CIV.A. 14-2228, 2015 U.S. Dist. LEXIS 48822, at *2 n.4, 2015 WL 1650255, at *1 n.4 (E.D. La. Apr. 14, 2015); *McGee v. Arkel Int'l LLC*, No. CIV.A. 08-4704, 2012 U.S. Dist. LEXIS 172475, at *9, 2012 WL 6049156, at *3 (E.D. La. Dec. 5, 2012). However, courts within the Fifth Circuit have decided differently when, as explained in the preeminent treatise on federal procedural law, "some of the defects raised in the original motion remain in the new pleading." *E.g.*, *Thomas v. Miramar Lakes*

## C.    PARTIES' ARGUMENTS

## 1.    First MTD

Filed by the Natural Defendants, the First MTD seeks dismissal on the basis of Federal Rule of Civil Procedure 12(b)(6)[6] for four separate, if interrelated, reasons.

First, according to this motion, Plaintiffs fail to state a claim against either person in his individual capacity or provide sufficient facts to "negate the[se] defendants' assertions of qualified immunity ". (Doc. 7-1 at 3–4.) In other words, "[t]he Plaintiffs have failed to allege sufficient facts to establish that Sheriff Gautreaux or Warden Grimes' conduct violated clearly established constitutional rights regarding the medical care of Cleveland," as they have not alleged facts "show[ing] any personal involvement by Sheriff Gautreaux or Warden Grimes[] in providing medical care to Cleveland." (*Id.* at 4–5.) While Grimes and Gautreaux may still be liable "under a theory of *respondeat superior*," Plaintiffs have not properly pled the requisite elements for such supervisory liability. (*Id.* at 5–6.) Neither "affirmatively participated in the treatment of Cleveland's medical needs while at the Prison," and no failure to train or adopt a policy, motivated by either person's deliberate indifference, has been pled, as the law requires. (*Id.* at 6–8.) In short, "[t]he Plaintiffs do not allege sufficient facts to show that Sherriff

---

*Homeowners Ass'n*, No. 4:13-CV-1479, 2014 U.S. Dist. LEXIS 109839, at *11–12, 2014 WL 3897809, at *4–5 (S.D. Tex. Aug. 6, 2014) (citing to 6 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1476 (3d. ed. 2013)); *cf. Bodenheimer v. Williams*, No. 14-740 Section "K"(4), 2015 U.S. Dist. LEXIS 96297, at *2–4 (E.D. La. July 23, 2015) (summarizing the divide over this particular issue). As the Amended Complaint does not change the substantive allegations pertinent to the resolution of the First and Second MTDs, this Court will not treat Defendants' motions as moot. After all, Federal Rule of Civil Procedure 1 prizes both justice and efficiency. *See* FED. R. CIV. P. 1.

[6] In this ruling, any and all references to "Rule" or "Rules" are to one or more of the Federal Rules of Civil Procedure unless otherwise noted.

Gautreaux or Warden Grimes acted with deliberate indifference in allegedly failing to adopt procedures to properly recognize or treat mental illness or to transport inmates with serious medical needs or mental illness to facilities better able to treat them." (*Id.* at 8.) When considered with another—"There is no allegations that Sheriff Gautreaux or Warden Grimes knew that procedures were inadequate, but refused to promulgate written policies to address it"—Plaintiffs' failure under Rule 12(b)(6) cannot be reasonably questioned. (*Id.*)

Second, as these Natural Defendants propose, Plaintiffs do not allege sufficient facts to show a violation of Cleveland's rights under the Fourteenth Amendment, either as to his general conditions of confinement or due to any episodic act by either defendant. (*Id.* at 8–12.) As to the former, Gautreaux and Grimes contend that "[a] detainee challenging jail conditions must demonstrate more than an incident; he [must] demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights." (*Id.* at 9.) Crucially, as the First MTD thereupon emphasizes, "[t]he effective management of a detention facility is a valid objective that may justify imposition of conditions and restrictions on pretrial detention." (*Id.*) But Plaintiffs here have "fail[ed] to allege a pervasive pattern of serious deficiencies in providing adequate health care to pretrial detainees with heart problems or mental illness"; indeed, they fail to allege any specific deficiency or omission." (*Id.* at 10.) Other prisoners may have died as an alleged "result of inadequate medical care," but such a statement does not amount to "a specific claim of a pattern of specific similar omissions as in this case that allegedly caused these inmates['] death[s]." (*Id.*) To clinch this argument, Gautreaux and Grimes conclude this section: "Plaintiffs have not alleged facts to show that the 'conditions' [at EBRPP] amounted to punishment and . . . [were] not incident to some other legitimate governmental purpose." (*Id.*)

Moving on to Plaintiffs' Episodic Act Claim, these defendants first note—"[the] deliberate indifference [required for such claims] cannot be inferred from a negligent or even grossly negligent response to a substantial risk of serious harm"—and conclude: "Plaintiffs' conclusory allegation[s are] not sufficient to show that either Sheriff Gautreaux or Warden Grimes was aware that Cleveland was allegedly not receiving medication, without which he would suffer serious harm; [or] that either actually drew that inference and his response indicates he intended the harm to occur." (*Id.* at 11.) Accordingly the "stringent test of showing . . . deliberate indifference to Cleveland's medical needs" required for an episode claim has not been met by the Complaints as filed. (*Id.* at 11–12.)

Third, even if Plaintiffs were suing Gautreaux and Grimes in their official capacities, the allegations made are insufficient to establish the necessary form of municipal liability. (*Id.* at 12–14.) In particular, Plaintiffs have failed to show that either defendant "disregarded a known or obvious consequences of his action," "to identify a single policy or custom . . . that caused Cleveland's injuries," or suggest this duo's endorsement of a defective training regimen for their employees and subordinate. (*Id.* at 14–15.) By not having properly alleged one such defect, Plaintiffs have failed to state a claim against the Natural Defendants even in their official capacities.

Fourth, Grimes and Gautreaux question the viability of Plaintiffs' ADA Claim. According to these two persons, "Plaintiffs' allegations of deficient, substandard and inadequate medical treatment are insufficient to establish that the[se] defendants denied Cleveland the benefits of services, programs, or activities of . . . [EBRPP] on the basis of his disabilit[]ies under the ADA." (*Id.* at 17.) PMS, EBRPP, Grimes, and Gautreaux themselves provided Cleveland with much "access to medical treatment and services," including "medical evaluations,

screening, nurse and doctor consultations, psychiatric consultations and treatment, medication, and diagnostic procedures." (*Id.* at 17–18.) Whatever these services' ineffectiveness, "the ADA does not create a remedy for medical malpractice." (*Id.* at 18; *accord* Doc. 8-1 at 4.) In addition, by engaging in "a formulaic-type recitation of the elements of an ADA claim," Plaintiffs fail to show Gautreaux and Grimes discriminated against Cleveland by virtue of his disability, as the ADA mandates. (*Id.* at 18–19.)

As a concession, Defendants take no issue with Plaintiffs' "state law claims of negligence." (*Id.* at 19.) Rather, "[i]n the event this Court dismisses the federal claims against Sheriff Gautreaux and Warden Grimes, they respectfully ask that this Court decline to exercise its supplemental jurisdiction over the state law claim." (*Id.*) In other words, at least for now, Defendants raise no issue as to factual adequacy of the Complaints as to their sixth and final count.

## 2.  Plaintiffs' Response to First MTD

After summarizing the Complaint,[7] Plaintiffs challenge every one of the assertions made in the First MTD. As to Count One, they contend that "[t]he Plaintiffs' Complaint contains sufficient factual detail of incidents and dates when . . . Cleveland was denied adequate medical care through numerous interactions with different prison personnel [so as] to infer a *de facto* policy of failing to provide adequate medical care." (Doc. 13 at 7.) Plaintiffs' make an identical rejoinder in defense of the Complaint's second and third counts. (*Id.* at 7–13.) In their words, by

---

[7] As previously noted, *see supra* Part II.B, the Complaints are identical in their substantive content as to the relevant counts. However, as the First and Second MTDs were docketed before the Amended Complaint was filed, the Parties' motions often refer back to the First Complaint alone.

pointing to "a series of interactions with prison personnel, who avoided . . . Cleveland and

dismissed his legitimate and serious medical needs, . . . Plaintiffs have sufficiently alleged

pervasive deficiencies in the system with respect to treating patients who are mentally ill and the

*de facto* policy of failing to treat prisoners with mental illness," their second count. (*Id.* at 10.)

Similarly, they have "asserted sufficient factual allegations on every prong of a conditions of

confinement claim: a pervasive, *de facto* policy of failing to provide for the basic human need of

adequate medical care that caused the death of . . . Cleveland and served absolutely no legitimate

governmental objective," the essence of their pleadings' third count. (*Id.* at 13.)

      As to their fourth count, "Defendants' failure to train prison personnel on . . . Cleveland's

constitutional right to medical care," a right "well and clearly established," "resulted in the

ultimate harm: death," while Defendants "certainly knew or should have known that there were

serious deficiencies in the implementation of prison policy on access to medical care." (*Id.* at

15.) In fact, as the Complaint alleges, Grimes had "actual knowledge," and Plaintiffs do "allege a

pattern of similar denials," i.e. the death of "at least 4 other inmates" at EBRPP "due to

inadequate medical care." (*Id.* at 15–16) In Plaintiffs' view, Defendants' "policy of failing to

provide medical care can be categorized as a failure to implement a policy," this failure sufficient

to establish liability for purposes of an episodic claim. (*Id.* at 16.) Next, Plaintiffs defend their

ADA Claim. They note that Cleveland qualified as a disabled individual and stress, as required

to show discrimination under the ADA, that his disability was not accommodated and that he

was denied access to medical care due to his condition.[8] (*Id.* at 17.) Lastly, Plaintiffs deny the

---

[8] The ADA only requires, as Plaintiffs recognize, either failing for a cognizable cause of action
to exist. *See infra* Part III.A.4.

applicability of the defense of qualified immunity at this time, as they seek damages for objectively unreasonable violations of a clearly established constitutional right.

### 3.        Second MTD

Unlike the First MTD, the Second MTD is predicated wholly upon PMS' reading of the ADA.[9] According to PMS, as Plaintiff's first pleading and the Amended Complaint amply reveal, Cleveland did receive medical care. (Doc. 8-1 at 4.) Allegedly, PMS' care was "inadequate and even hurtful." (*Id.*) Yet, as argued in the First MTD, (Doc. 7-1 at 18), "[t]he ADA does not create a cause of action for medical malpractice"; therefore, "[a]n incarcerated individual cannot state a claim based simply upon a prison's failure to attend to the medical needs of disabled prisoners." (Doc. 8-1 at 4.) Whatever Plaintiffs' dissatisfaction "with the quality or quantity of care afforded to Cleveland by . . . [PMS] or its staff," neither of Plaintiff's complaints "allege a denial of services, especially a denial of services based on discrimination." (*Id.*) In its view, "[n]owhere in the complaint[s] is there even an attempt to show that . . . [PMS] and its staff and affiliated physicians were guilty of discrimination against Cleveland based solely on his alleged disability." (*Id.* at 5.) Instead, Plaintiffs have done no more than "assert[] that Cleveland was denied medical services, medication, and medical devices based on his disability[,] . . . but this is a mere formulaic-type recitation of the element of an ADA claim." (*Id.*) In sum, because "Plaintiff[s] cannot assert on the one hand the denial of medical services sufficient to state a cuase of action under the ADA while on the other hand asserting that

---

[9] Even so, the Second MTD echoes the objections raised by the First MTD as to Plaintiffs' ADA claims. (*Compare id.*, *with* Doc. 7-1 at 16–19.) Indeed, identical language appears in the two motions as to this particular issue. (*Compare* Doc. 8-1 at 5, *with* Doc. 7-1 at 19.)

Cleveland received medical care that was incompetent," their "two positions . . . oxymoronic," they have failed to state a claim for relief under this anti-discrimination statute. (*Id.*)

**4.      Plaintiffs' Response to Second MTD**

Centered solely on PMS' attack on Plaintiffs' ADA claim, the Opposition to Second MTD is substantively and textually identical to the relevant portion of the Opposition to the First MTD. (*Compare* Doc. 11 at 2–6, *with* Doc. 13 at 16–19.)

**III.     DISCUSSION**

**A.     GOVERNING LAW**

**1.      Dismissal Standard**

Rule 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." F~ED.~ R. C~IV.~ P. 12(b)(6). The analysis mandated by Rule 12(b)(6) analysis incorporates the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*: "To pass muster under Rule 12(b)(6), [a] complaint must have contained enough facts to state a claim to relief that is plausible on its face." *Reece v. U.S. Bank Nat'l Ass'n*, 762 F.3d 422, 424 (5th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007)); *accord Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). In the course of this determination, a court "must" still "consider the [factual] allegations in the plaintiff's complaint as true." *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *accord, e.g.*, *S.R.P. v. United States*, 676 F.3d 329, 344 (3d Cir. 2012). A claim possesses the requisite facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the relevant defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129

S. Ct. 1937, 1949, 173 L. Ed. 2d 868, 884 (2009). Generally, then, even though a court must

view all well-pleaded facts in the light most favorable to the non-moving party, *Baker v. Putnal*,

75 F.3d 190, 196 (5th Cir. 1996), the factual allegations must be enough to raise a right to relief

above the speculative level, *Twombly*, 550 U.S. at 555.

**2.      Plaintiffs' Constitutional Claims**

The constitutional rights of a pretrial detainee flow from both the procedural and

substantive due process guarantees of the Fourteenth Amendment.[10] *Olabisiomotosho v. City of*

*Houston*, 185 F.3d 521, 525 (5th Cir. 1999). Such constitutional challenges by pretrial detainees

may be brought under two alternative theories: as an attack on a "condition of confinement" or as

an "episodic act or omission." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009); *see*

*also Reed v. Wichita Cnty. (Estate of Henson)*, 795 F.3d 456, 464 (5th Cir. 2015) ("[T]here is no

rule barring a plaintiff from pleading both alternative theories[.]"). "The Fourteenth Amendment

requires that state officials not disregard the 'basic human needs' of pretrial detainees, including

---

[10] In contrast, an inmates' rights arise from the Eighth Amendment. Briefly, to plead an Eighth
Amendment violation based on the conditions of an *inmate*'s confinement, "a plaintiff must
allege conditions that pos[e] a substantial risk of serious harm" and "that the defendant prison
officials were deliberately indifferent to the inmate's health or safety." *Hinojosa*, 807 F.3d at 665
(alteration in original) (internal quotation marks omitted). "A prison official acts with deliberate
indifference when he knows of and disregards an excessive risk to inmate health or safety; the
official must both be aware of facts from which the inference could be drawn that a substantial
risk of serious harm exists, and he must also draw the inference." *Id.* (internal quotation marks
omitted). With "extreme deprivations" normally necessary, *Hudson*, 503 U.S. at 9, "[c]onditions
. . . involv[ing] the wanton and unnecessary infliction of pain" or "grossly disproportionate to the
severity of the crime warranting imprisonment" will often suffice, *Rhodes v. Chapman*, 452 U.S.
337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59, 69 (1981); *see also Ball v. LeBlanc*, 792 F.3d
584, 592 (5th Cir. 2015) ("[T]he Constitution 'does not mandate comfortable prisons,' but
neither does it permit inhumane ones" (internal quotation marks omitted) (quoting *Farmer v.
Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811, 822 (1994))). As
explained further in this subsection, the standards often overlap, especially as to the deliberate
indifference standard employed in certain cases.

medical care." *Reed v. Krajca (Estate of Henson)*, 440 F. App'x 341, 343 (5th Cir. 2011). Put differently, "the substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee." *Reed*, 795 F.3d at 462 (citing *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1872, 60 L. Ed. 2d 447, 466 (1979)). Any "punishment" of a pretrial detainee, therefore, will run afoul of the Constitution. *Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 206 (5th Cir. 2011).

As *Reed* explains*,* "challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Reed*, 795 F.3d at (quoting *Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 644 (5th Cir. 1996)). Though courts "routinely rejected conditions of confinement claims well into . . . [the 20th] century," *Helling v. McKinney*, 509 U.S. 25, 39, 113 S. Ct. 2475, 2484, 125 L. Ed. 2d 22, 35 (Thomas, J., dissenting) (internal quotation marks omitted), no debate now beclouds their validity, *see Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156, 167 (1992). Of course, the punitive and hence forbidden "conditions, practices, rules, and restrictions can be explicit." *Id.* (relying on *Shepherd*, 591 F.3d at 452). Yet, such a condition may also "reflect an unstated or de facto policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Id.* (alteration in original) (internal quotation marks omitted) (citing *Hare*, 74 F.3d at 644–45). Regardless, "if a restriction or condition is not reasonably related to a legitimate goal— if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* (internal quotation marks omitted) (citing *Bell*, 441 U.S. at 539); *accord Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004).

Axiomatically, "[t]he medical care a prisoner receives is just as much a 'condition' of his [or her] confinement as the food he [or she] is fed." *Wilson v. Seiter*, 501 U.S. 294, 303, 111 S. Ct. 2321, 2326, 115 L. Ed. 2d 271, 282 (1991). Furthermore, as a matter of law, "[a] State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction," and "even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." *Hare*, 74 F.3d at 644; *accord Reed*, 795 F.3d at 463. Consequently, "a true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation." *Hare*, 74 F.3d at 644–45. Though not expressly, "[t]he Fifth Circuit has at least suggested that condition-of-confinement claims are cognizable against individual actors only in their official capacities." *Nagle v. Gusman*, No. 12-1910 Section "R"(2), 2016 U.S. Dist. LEXIS 23747, at *16–17, 2016 WL 768588, at *5 (E.D. La. Feb. 26, 2016) (collecting cases).

In contrast, "where the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an episodic act or omission case." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (internal quotation marks omitted). The relevant question now "becomes whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge, and intentionality is no longer presumed." *Reed*, 795 F.3d at 463 (internal quotation marks omitted) (citing *Hare*, 74 F.3d at 645). For such a violation to be found, the official must have "subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference."[11] *Hare*, 74 F.3d at 650.

---

[11] Notably, the Eighth Amendment standard of deliberate indifference has been used in the episodic claim context. *Silva v. Moses*, 542 F. App'x 309, 310 (5th Cir. 2013); *see also Thomas*

Generally, "[d]eliberate indifference is shown when the official knows of and disregards an excessive risk to inmate health or safety," and "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Reed*, 440 F. App'x at 343. Per binding precedent, "proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is *normally* required before such lack of training or supervision constitutes deliberate indifference." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001) (emphasis added). Frequently, "a plaintiff must demonstrate a pattern of similar incidents in which the citizens were injured." *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998). Just as clearly, "the inadequacy of training must be obvious and obviously likely to result in a constitutional violation." *Thompson*, 245 F.3d at 459. "Negligence or even gross negligence is not enough." *Campos v. Webb Cnty.*, 597 F. App'x 787, 792 (5th Cir. 2015) (citing to *Hare*, 74 F.3d at 650). But, deliberate indifference does exist "where a plaintiff shows that officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) (internal quotation marks omitted). In effect, for purposes of Rule 12(b)(6), therefore, the factual allegations must set forth no more than such a minimal case.

**3.      Municipal Liability**

Named after the famed case that first recognized it, *Monell v. Dep't. of Social Sciences*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), *Monell* liability requires proof of four

---

*v. Mills*, 614 F. App'x 777, 778 (5th Cir. 2015) (observing that "the deliberate indifference standard articulated by the Supreme Court in *Farmer v. Brennan* . . . applies to pretrial detainees and convicted prisoners alike" (citations omitted)).

elements: (1) a policymaker; (2) an official policy; (3) a constitutional violation;[12] and (4) a violation of that constitutional right whose "moving force" is "the policy or custom," *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (construing (3) and (4) as one element). Stated differently, "[a] plaintiff must point to a persistent and widespread practice[] of municipal [or state] officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference"; as such, knowledge and indifference, factors incorporating subjective and objective components, are required, as is an actual threshold constitutional violation. *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402–03 (4th Cir. 2014); *see also, e.g.*, *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997) ("The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." (internal quotation marks omitted)); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (enumerating the pertinent elements).

*Monell* "presupposes a conscious adoption of a course of action 'from among various alternatives.'" *Shadrick*, 805 F.3d at 752. The practice that it and its progeny forbid, moreover, must be "so persistent and widespread and so permanent and well settled as to constitute a custom or usage with *the force of law*,"[13] *Moody v. City of Newport News*, 93 F. Supp. 3d 516,

---

[12] Arguably, merely the deprivation of a federal right will suffice. *King v. Kramer*, 764 F.3d 635, 649 (7th Cir. 2014).

[13] Under *Monell*, liability may be shown in four separate ways. *See, e.g.*, *Castanza v. Town of Brookhaven*, 700 F.Supp.2d 277, 287 (E.D.N.Y. 2010).

542 (E.D. Va. 2015) (emphasis added). It is, as the Fifth Circuit has emphasized, "difficult to prove," *Anderson v. Marshall Cnty., Miss.*, No. 15-60051, 2016 U.S. App. LEXIS 621, at *12–13, 2016 WL 143303, at *4 (5th Cir. Jan. 12, 2016), though some circuits permit trial courts to infer the requisite knowledge and indifference from a proven record of "widespread or flagrant violations," *Owens*, 767 F.3d at 403 (internal quotation marks omitted).

4.      ADA

Under well-established precedent, a prisoner may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act ("RA").[14] *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10, 118 S. Ct. 1952, 1954–55, 141 L. Ed. 2d 215 (1998); *see also, e.g.*, *Frame v. City of Arlington*, 657 F.3d 215, 224–25 (5th Cir. 2011). Title II prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state penal institutions like EBRPP fall squarely within this statutory definition, *see Yeskey*, 524 U.S. at 210. As a general matter, a plaintiff proceeding under Title II must "show that: (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity." *Douglas v.*

---

[14] Section 504 of the Rehabilitation Act protects qualified individuals from discrimination on the basis of disability by entities receiving financial assistance from any federal department or agency. 29 U.S.C. § 794 *et seq.* Passed in 1973, the ADA expanded upon its protections. Naturally, therefore, the same prima facie case be made by a disabled plaintiff under both acts, *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999), and courts readily "examine cases construing claims under the ADA, as well as [S]ection 504 of the Rehabilitation Act, because there is no significant difference in the analysis of rights and obligations created by the two Acts," *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002). Though Plaintiffs focus overwhelmingly on the ADA, they make occasional references to the RA as well.

*Gusman*, 567 F. Supp. 2d 877, 889 (E.D. La. 2008).[15]

Notably, while the ADA's reasonable accommodation requirement does not apply under Title II, its "reasonable modifications" requirement—"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001)—has been held to apply in the prison context. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). This distinction has two consequences. Overall, the ADA "does not require prisons to provide *new* services or programs for disabled prisoners." *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015) (emphasis added). However, these same entities "do have an affirmative obligation to make reasonable modifications . . . so that a disabled prisoner can have meaningful access to *existing* public services or programs." *Id.* (emphasis added).

Directly relevant to the Parties' instant dispute, the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA. *See, e.g.*, *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). No requirement for a showing of an intentional harm has yet been appended to either statute by other circuits. *E.g.*, *Liese v. Indian River Cnt. Hosp. Dist.*, 701 F.3d

---

[15] While the Parties dispute whether discrimination took place, *see supra* Part II.C., Defendants do not seriously question the fact that Cleveland's many ailments rendered him disabled physically and mentally. Even if they did, the law would require such classification. *See* 42 U.S.C. § 12102.

334, 345 (11th Cir. 2012); *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir.

1999). As a result, in the context of the ADA, if not for purposes of the Eighth Amendment,

"intentional discrimination against the disabled does not require personal animosity or ill will";

"it may be inferred when a policymaker acted with at least deliberate indifference to the strong

likelihood that a violation of federally protected rights will result from the implementation of the

challenged policy . . . or custom." *Bartlett v. N.Y. State Bd. of Law Examiners*, 156 F.3d 321, 331

(2d Cir. 1998). As such, based on much precedent, the failure to provide a disabled inmate with

access to existing modifications can be held to violate the ADA's second title. *See, e.g.*, *McCoy*

*v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 U.S. Dist. LEXIS 55403, at *23–24, 2006

WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) ("In the prison context, . . . failure to make

reasonable accommodations to the needs of a disabled prisoner may have the effect of

discriminating against that prisoner because the lack of an accommodation may cause the

disabled prisoner to suffer more pain and punishment than non-disabled prisoners.").


**B.    APPLICATION**

Though "there is no rule barring a plaintiff from pleading both" an episodic act or

omission claim and a condition of confinement claim, a court should "properly evaluate each

separately." *Reed*, 795 F.3d at 464. Two related issues—the reach, if any, of the doctrine of

municipal liability and the propriety of the defense of qualified immunity—must too be weighed,

as each doctrine bears on the plausibility of Plaintiffs' constitutional claims. Last but not least,

Plaintiffs' ADA claim must be independently analyzed. In the end, however fragile it may appear

to the Natural Defendants now, a reed is still a reed for purposes of Rule 12(b)(6).[16] Flimsy is

still plausible when all well-pleaded allegations merit the presumption of truth. *See Williamson*,

645 F.2d at 412.

### 1.      Confinement Claims (Counts One, Two, and Three) & Supervisory Liability

To maintain a condition-of-confinement claim, a plaintiff must show (1) a condition of a

pretrial detainee's confinement that is (2) not reasonably related to a legitimate governmental

interest and that (3) violated that detainee's constitutional rights. *See Edler v. Hockley Cty.*

*Comm'rs Court*, 589 F. App'x 664, 668 (5th Cir. 2014). A "condition of confinement" can be a

rule, restriction, practice, or general condition of pretrial confinement. *Id.*; *Scott v. Moore*, 114 F.

3d 51, 53 (5th Cir. 1997). "If the plaintiff seeks to base his or her constitutional claim on an

*unstated* rule or policy, however, the plaintiff must show that one or more jail officials' acts or

omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive

misconduct by other officials, to prove an intended condition or practice." *Nagle*, 2016 U.S. Dist.

LEXIS 23747, at *26, 2016 WL 768588, at *9 (emphasis in original). For this claim's purposes,

a plaintiff need not show deliberate indifference. *Duvall*, 631 F.3d at 207.

Here, Plaintiffs' pleading readily—and plausibly—puts forward such a claim.

Throughout the Complaints, Plaintiffs allege defects in the medical care that Cleveland obtained

during his time at EBRPP, a prison run by Grimes and under the jurisdiction of Gautreaux.

According to these two documents, EBRPP officials were repeatedly informed of Cleveland's

perilous medical state, (Doc. 13 at 5; *see also* Doc. 1 at 3–4; Doc. 45 at 3–4), as confirmed by

---

[16] It is worth noting that, if a jurisdictional attack had been made pursuant to Rule 12(b)(1) or (2),
a flimsy reed would not have been effective.

Cleveland's apparently insistent complaints to EBRPP officials, (Doc. 1 at 3–6; Doc. 45 at 3–6), his doctor's own prescription, (Doc. 1 at 5; Doc. 45 at 5), his family's continual calls, (Doc. 1 at 3–8; Doc. 45 at 3–8), and EBRPP's own notes and tests, (Doc. 1 at 7–8; Doc. 45 at 7–8).

When Cleveland asked for a wheelchair, his request was denied for no apparent reason, and an appointment with a psychiatrist scheduled instead. (Doc. 1 at 6; Doc. 45 at 6). And when Cleveland suffered shortness of breath, he was instead placed on suicide watch for "bizarre and abnormal behavior." (Doc. 1 at 7; Doc. 45 at 7). At one point, one prison doctor refused to provide Cleveland with a wheelchair because "he was fat and needed to walk more." (Doc. 1 at 5; Doc. 45 at 5.)Thereafter, "prison officials" at EBRPP, the institution run by Grimes and Gautreaux, denied Cleveland such access "because it . . . [had not] been approved of by [the] EBRPP medical doctor," the same man who purportedly refused on the basis of Cleveland's weight. (Doc. 1 at 5; Doc. 45 at 5.) Purportedly, on one occasion, "Grimes informed . . . LeBlanc that he had no control over prison medical services and that there was nothing he could do about the situation." (Doc. 1 at 5; Doc. 45 at 5.) Yet, after Cleveland's family contacted Gautreaux, among others, Grimes suddenly "reached out to the prison medical department about . . . Cleveland" and "questioned why Cleveland was still in lockdown if he had not been taken off suicide watch." (Doc. 1 at 7; Doc. 45 at 7.)

If this Court treats these and other allegations as true, as it must under Rule 12(b), a certain image comes into plausible focus: though Cleveland suffered from sundry "serious medical conditions," (Doc. 13 at 5), appropriate medical care was never given in accordance with a policy that "serves absolutely no administrative goal," (Doc. 1 at 11; Doc. 45 at 11). Whether stated or unstated, this policy, naturally and logically, had been adopted and/or enforced by Grimes and Gautreaux, both of whom had notice of Cleveland's allegedly inadequate

conditions and, on at least one occasion, specifically interceded on his behalf. Not purely

"conclusory," as Gautreaux and Grimes claim, (Doc. 7-1 at 10), these allegations tell a dramatic

tale.

As a matter of law, "inadequate medical care . . . is a condition of his [or her]

confinement." *Wilson*, 501 U.S. at 303.  In such cases, when "[a] jail's evaluation, monitoring,

and treatment of inmates with chronic illness" is "grossly inadequate due to poor or non-existent

procedures and . . . caused . . . injury," a court can "reasonably infer a de facto jail policy of

failing properly to treat inmates with chronic illness." *Shepherd*, 591 F.3d at 453; *see also Edler*

*v. Hockley Cnty. Comm'rs Ct.,* 589 F. App'x 664, 668 (5th Cir. 2014). True, despite this precept,

many courts have nonetheless "reject[ed] a challenge-to-conditions claim where the evidence

does not show a systematic policy or failure." *Campos*, 597 F. App'x at 792. But, though

Defendants contend otherwise, Plaintiffs have here pointed to the untimely death of three other

pretrial detainees. (Doc. 1 at 11; Doc. 45 at 11.) As such, Plaintiffs have shown more than "an

isolated incident." *Shepherd*, 591 F.3d at 454; *accord Reed*, 795 F.3d at 469. Rather, as *Shepherd*

mandates, they have detailed EBRPP's inadequate treatment of Cleveland over a period of weeks

and its similarly deficient treatment of other inmates over a period of two years. 591 F.3d at 453–

54; *see also, e.g.*, *Perez v. Live Oak Cnty.*, No. C-10-001, 2010 U.S. Dist. LEXIS 128366, at

*12–13, 2010 WL 5067662, at *5 (S.D. Tex. Dec. 6, 2010) ("A conditions of confinement case

can be made out when the general practices of jail officials engender harm to inmates, even

where there is an immediate causal relationship between particular acts or omissions and the

injury suffered."). In fact, "[p]roblems that are so common as to be generally known . . . [can]

trigger liability even if the specific application of that problem to Plaintiffs' decedent is not

known." *Cheek v. Nueces Cnty. Tex.*, No. 2:13-CV-26, 2013 U.S. Dist. LEXIS 110039, at *40, 2013 WL 4017132, at *14 (S.D. Tex. Aug. 5, 2013).

Based on the pleadings, then, Plaintiffs have pointed to a recognizable and unconstitutional condition and alleged that it served no legitimate, non-punitive governmental objective, each pivotal allegation supported by a factual recitation regarding Defendants' knowledge of specific incidents at EBRPP. *Bell*, 441 U.S. at 539; *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000). Regardless of the eventual sufficiency of the evidence to support this claim, this Court is now tasked "only with determining whether there are sufficient factual allegations to put . . . [Defendants] on notice of a viable claim." *Cheek*, 2013 U.S. Dist. LEXIS 110039, at *41, 2013 WL 4017132, at *15. Based on the existing law, Plaintiffs have done so as to their every conditions claim (Counts One, Two, and Three), the defective conditions alleged so widespread and known that Grimes and Gautreaux cannot now evade responsibility for purposes of Rule 12(b) by claiming their undisturbed ignorance.

In response to this particular claim, Defendants first fault Plaintiffs for failing to allege the prerequisites for supervisory liability. *Howard v. Adkison*, 887 F.2d 134, 137,138 (8th Cir. 1989). "[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987); *see also McGrath v. Scott*, 250 F. Supp. 2d 1218, 1222, 1223 (D. Ariz. 2003) (distinguishing between municipal and supervisory liability).  In this circuit, "[t]o succeed on a failure to train claim, a plaintiff must show that (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of . . .

[a] plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).

For purposes of Rule 12, so long as a plaintiff alleges the existence of certain training deficiencies and how and why the relevant defendants should have known of these particular problems, the necessary indifference will be found. *See, e.g.*, *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 254, 256 (5th Cir. 2005); *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005). In other words, at the pleading stage, allegations of "tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct" will defeat a motion to dismiss predicated on Rule 12(b)(6). *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998). For this reason, "[s]upervisory liability can be established without direct participation in the alleged events if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Brown v. Bolin*, 500 F. App'x 309, 314 (5th Cir. 2012) (*Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002)). "Existence of a constitutionally deficient policy cannot be inferred from a single wrongful act." *Id.*

Based on this jurisprudence, Plaintiffs' allegations are sufficient to support constitutional claims against Grimes and Gautreaux in their individual capacities because, considered in toto, they state a factual basis for determining that both men knew or should have known of that EBRPP's system was so deficient as to expose prisoners with ailments similar to Cleveland's own to substantial risk of significantly unmet serious medical needs—i.e., was unconstitutional—and failed to properly attempt to correct it, and that their actions or inactions in this respect caused Cleveland's fatality.[17] *See Thompson*, 245 F.3d at 459 (noting that "[p]roof

---

[17] In part, Defendants attempt to evade this responsibility by denying their responsibility for EBRPP's medical services. (Doc. 7-1 at 5.) In making this claim, however, Defendants overlook

of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required"). With Plaintiffs' cause of action grounded in factual allegations and thus still plausible, Grimes and Gautreaux have failed to demonstrate that they are entitled to dismissal on the basis that the pleading does not adequately state a claim against them.

As an additional defense, Defendants blandly assert that "[t]he effective management of a detention facility is a valid objective." (Doc. 7-1 at 9.) Yet, having already attacked Plaintiffs for use of such conclusory assertions, Defendants do so without explaining why the denial of the medical treatment that Cleveland sought but did not receive, the actual and particular conditions to which Cleveland was subjected, was crucial for this end's attainment, *see Bell*, 441 U.S. at 540 (noting that "the effective management of the detention facility once the individual is confined is a valid objective that *may* justify imposition of conditions and restrictions of pretrial confinement" (emphasis added)). Indeed, at face value, Defendants' assertion would immunize any and all conditions from review upon the invocation of such an apparent interest.

Nonetheless, while "[a]mong the legitimate objectives recognized by the Supreme Court are ensuring a detainee's presence at trial and maintaining safety, internal order, and security within the institution," *Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir. 1995), not one of these recognizable aims can said to justify EBRPP's persistent failure to provide

---

two crucial facts. First, whether or not the City/Parish has "financial responsibility" for EBRPP's medical regimen does not affect whether EBRPP's policymakers and administrators, including Grimes and Gautreaux, have some responsibility for its inmates' minimal health under § 1983. *Cf. United States v. Louisiana*, No. 11-cv-00470-JWD-RLB, 2016 U.S. Dist. LEXIS 97236, at *103 –10, 147 –48 (M.D. La. July 26, 2016). Second, the medical personnel need not be their employees for their misconduct to be ascribed to Gautreaux and Grimes. So long as the practice of EBRPP, the entity over which they preside, resulted in an unconstitutional deprivation with their tacit acquiescence, supervisory liability will lie. *See Camilo-Robles*, 151 F.3d at 7.

Cleveland with a wheelchair or offer treatment of his numerous—and exceedingly well-documented and widely-aired—physical ailments, (Doc. 45 at 5–10; Doc. 1 at 5–10.) Repeatedly, Cleveland allegedly complained of chest, leg, and neck pain, concerns evidenced by his own medical files, and though he was shackled and placed on suicide watch, his physical deterioration was seemingly ignored and left untreated by EBRPP's and PMS' staff. (Doc. 45 at 5–10; Doc. 1 at 5–10.) As "[t]he medical care a prisoner receives is just as much a 'condition' of his confinement as the food he [or she] is fed," *Wilson*, 501 U.S. at 303, this allegedly willful blindness could be said to constitute health threats and thus implicate the Fourteenth Amendment's guarantees, *see Wilson v. Lynaugh*, 878 F. 2d 846, 849 (5th Cir. 1989). Once the Complaints' allegations are gathered and distilled, the avowed objective disappears, and the Natural Defendants' alleged failure to train or supervise is crystal clear.


### 2.      Episodic Acts or Omissions (Count Four)

With an episodic-act-or-omission claim, "the complained-of harm is a particular act or omission of one or more officials." *Scott*, 114 F.3d at 53. In such cases, a plaintiff "complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Id.* For purposes of imposing liability on a defendant in his or her *individual* capacity in such a case, a pretrial detainee must establish that the defendant acted with subjective deliberate indifference. *Id.* A person acts with subjective indifference if (1) "he [or she] knows that an inmate faces a substantial risk of serious bodily harm," and (2) "he [or she] disregards that risk by failing to take reasonable measures to abate it." *Anderson v. Dallas Cty., Tex.*, 286 F. App'x 850, 860 (5th Cir. 2008) (citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).

To establish liability on a defendant in his or her official capacity, thereby holding a municipality accountable for the constitutional violation, the detainee "must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights." *Scott*, 114 F.3d at 54. The test for this form of indifference "considers not only what the policy maker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights." *Corley v. Prator*, 290 F. App'x 749, 750 (5th Cir. 2008) (relying on *Lawson v. Dallas Cnty.*, 286 F.3d 257, 264 (5th Cir. 2002)).

Here, Plaintiffs have put forth factual allegations that, if accorded the presumption of truth and considered cumulatively, plausibly establish Grimes' and Gautreaux's knowledge and deliberate indifference for purposes of Rule 12(b)(6). First, while PMS may have been managing EBRPP's medical services, Cleveland's psychological and physical conditions were amply documented in his own files and other sources. Allegedly, therefore, the cabinets and papers maintained by EBRPP, an entity headed and managed by Grimes and Gautreaux, contained explicit and mounting evidence of the precarious state of Cleveland's health and his overlooked medical needs. Furthermore, Grimes was twice informed of Cleveland's dire medical state and at least once spoke to officials about EBRPP's and PMS' treatment of Cleveland. (Doc. 1 at 5, 7; Doc. 45 at 5, 7; Doc. 21 at 3.) Gautreaux, charged with the prison's overall management, had been informed, at least once, of EBRPP's allegedly deficient care of Cleveland; as Plaintiffs allege, "[t]hey wrote a letter to Senator Mary Landrieu, and contacted Sheriff Sid Guatreux [sic], III's office and the District Attorney's office to try to get . . . Cleveland medical assistance." (Doc. 1 at 7; Doc. 45 at 7.) Like Plaintiffs' conditions-of-confinement allegations, these assertions, if believed, would leave a reasonable juror with a distinct impression: as Cleveland

declined, the Natural Defendants, cognizant of his particular suffering, failed to do what the law requires.

Had Cleveland given no indication of his seemingly perilous condition, had symptoms of his decline not been so pervasively recorded by multiple EBRPP and PMS employees, and had neither official been remotely implicated by the indifferent actions of the sundry individuals working in the very facility that they ran, neither Grimes nor Gautreux could be found liable as a matter of law. Here, however, based on Plaintiffs' papers, *see supra* Part II.A, a reasonable factfinder could still find that "the[se] official[s] were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], . . . dr[e]w the inference," and, by ultimately choosing to leave the relevant policies undisturbed, effectively assented to the episodic harms, from chills to heart murmurs to a tazer-induced death, inflicted by others working within EBRPP. *Krajca*, 440 F. App'x at 343; *see also, e.g.*, *Reed*, 795 F.3d at 464. "[A]n episodic event perpetrated by an actor interposed between . . . [Cleveland] and the . . . [City/Parish], but [it was] allegedly caused or permitted by the . . . general conditions" knowingly allowed by Grimes and Gautreux. *Scott*, 114 F.3d at 53. Having propounded as much in the Complaints, Plaintiffs have done enough to establish their liability at this time.

As the Fifth Circuit has explained, such subjective recklessness suffices for an episodic claim, as this standard "does not require the plaintiff to show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Butler v. Hood Cnty. (Estate of Pollard)*, 579 F. App'x 260, 265 (5th Cir. 2014) (citing *Farmer v. Brennan*, [18]511 U.S.

---

[18] For the reasons noted above, *see* note 11, while *Farmer* is technically an Eighth Amendment case, its definition of deliberate indifference has been used in the episodic claim context.

825, 842, 114 S. Ct. 1970, 1981, 128 L. Ed. 2d 811, 828 (1994)); *see also Thomas*, 614 F. App'x

at 778 (holding that when the record showed that a plaintiff had "requested but was denied" a

particular medical device, despite providing documents evidencing its need and underlying

medical condition, and when his specific problems were further evidenced "in the numerous

unsuccessful medical requests and grievances . . . [he] made to prison officials," a plausible

claim of deliberate indifference had been pleaded). Consequently, "[w]here prisons authorities

deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue

suffering or the threat of tangible residual injury . . . deliberate indifference is manifest."

*Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987); *see*

*also Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (holding that refusing to "treat" a

prisoner, "ignoring his complaints," "intentionally treat[ing] him incorrectly, or engag[ing] in

any similar conduct that would clearly evince a wanton disregard for any serious medical needs"

violates deliberate indifference standard encoded in the Eighth Amendment).[19]

Put differently, with both repeated failures to take better care of Cleveland and Grimes'

and Gautreaux' knowledge of and connection to these discrete omissions' repetition over a two

week period having been alleged, an episodic claim against EBRPP's sheriff and warden has

been plausibly asserted. *See, e.g.*, *Scott*, 114 F.3d at 53 ("In an 'episodic act or omission' case, . .

. the detainee complains first of a particular act of, or omission by, the actor and then points

derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or

caused the act or omission."); *Pomier v. Leonard*, 532 F. App'x 553, 555 (5th Cir. 2013) ("Under

*Farmer*, a prison official may be held liable . . . for denying humane conditions of confinement

---

[19] As noted above, *see supra* note 18, the same definition of deliberate indifference applies under
the Fourteenth Amendment.

only if he knows that inmates face a substantial risk of serious harm and disregards that risk by

failing to take reasonable measures to abate." (internal quotation marks omitted)); *Flores v. Cnty.*

*of Hardeman*, 124 F.3d 736, 738–39 (5th Cir. 1999) (concluding that a sheriff would have been

liable if, though knowing of a detainee's suicidal tendencies, had not taken taken "appropriate

actions" to provide that detainee with "adequate protection from known suicidal tendencies"). In

Plaintiffs' telling, officials at EBRPBB and PMS prevented Cleveland from receiving

recommended treatment; if later shown true, "[d]eliberate indifference to serious medical needs"

will have been shown. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980); *accord Hacker v.*

*Cain*, No. 3:14-00063-JWD-EWD, 2016 U.S. Dist. LEXIS 73014, at *48, 2016 WL 3167176, at

*15 (M.D. La. June 6, 2016).

      In conclusion, because the facts alleged by Plaintiffs in support of their claims are not

"fantastic or delusional" and their legal theories of liability are not "indisputably meritless," their

Episodic Claim must stand for now. *Eason v. Thaler*, 14 F.3d 8, 9 n.5 (5th Cir. 1994) (citing to

*Neitzke v. Williams*, 490 U.S. 319, 327 –28, 109 S. Ct. 1827, 1833, 104 L. Ed. 2d 338, 348

(1989)).


**3.**      **Issued Related to Plaintiffs' Constitutional Claims: Municipal Liability and**

          **Qualified Immunity**

      Municipal liability under § 1983 "requires proof of three elements: a policymaker; an

official policy; and a violation of constitutional rights whose moving force is the policy or

custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (internal quotation

marks omitted) (citing *Monell*, 436 U.S. at 694). In the First MTD, Gautreaux and Grimes fault

Plaintiffs for "fail[ing] to allege sufficient facts to make such a claim," as the pleadings do not

establish these men's deliberate indifference, one of this claim's "essential element[s]." (Doc. 7-1 at 12–13.) In so arguing, however, Defendants have ignored this element's nuanced construction. Generally, a de facto policy that remains in place despite high risks of constitutional violations is sufficient to demonstrate the "deliberate indifference" aspect of municipal liability. *Cheek*, 2013 U.S. Dist. LEXIS 110039, at *42, 2013 WL 4017132, at *15. Thus, "[i]f a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S. Ct. 1382, 1390, 137 L. Ed. 2d 626, 641 (1997). In such cases, "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Id.* (internal quotation marks omitted). Effectively, therefore, the applicable indifference standard looks at "not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the [pretrial detainee's] rights." *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008) (quoting *Lawson v. Dallas Cnty.*, 286 F.3d 257, 264 (5th Cir. 2002)).

Here, the allegations include at least two key propositions. First, Plaintiffs allege that EBRPP's existing level of medical care inadequately addressed its detainees' and inmates' serious medical needs. Second, they contend that Gautreaux and Grimes were aware (or should have been aware) that such men languished in their jails without receiving medical services adequate to the task for which they were held, calls having been made by Cleveland's family to Grimes, among others, and to Gautreaux from the office of a United States Senator.[20] Instead of

---

[20] At least for now, such a factual allegation belies any notion that Gautreaux knew nothing.

acting upon this information, EBRPP officials, including Grimes explicitly and Gautreaux implicitly, cited to their contract with PMS, denying any and all responsibility for the medical needs of the people housed in its cells and left in its care. *See Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417, 427 (2011) ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."). If proven, these bare allegations will satisfy the deliberate indifference requirement for municipal liability, rendering Gautreaux and Grimes liable in their official capacities under § 1983.

The Natural Defendants' reliance on the defense of qualified immunity is equally flawed, albeit for different reasons. In general, the defense of qualified immunity shields government agents, sued in their individual capacities, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S. Ct. 834, 838, 133 L. Ed. 2d 773, 783 (1996) (internal quotation marks omitted). Accordingly, "[t]he doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were *objectively reasonable* in light of then clearly established law." [21] *Thompson*, 245 F.3d at 456 (emphasis added). Once raised as a defense, a plaintiff bears the burden "to rebut this defense by

---

[21] Often, if not always, courts and parties confuse deliberate indifference (the standard for 1983 liability) with objective reasonableness (the standard for entitlement to qualified immunity). *Thompson v. Upshur Cnty.*, 245 F.3d 447, 458 n.8 (5th Cir. 2001). The Natural Defendants have seemingly done the same thing here.

establishing that the official's allegedly wrongful conduct violated clearly established law." *Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir. 1997).

Despite the Natural Defendants' insistence to the contrary, (*See, e.g.*, Doc. 7-1 at 3–4), Plaintiffs have readily met this threshold for purposes of Rule 12(b)(6). Unquestionably, "pretrial detainees have a [clearly established] constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining official."[22] *Thompson*, 245 F.3d at 457; *accord, e.g.*, *Hare*, 74 F.3d at 650; *Estate of Allison v. Wansley*, 524 F. App'x 963, (5th Cir. 2013). Just as clearly, delaying essential medical treatment for a detainee until a crisis occurs and when that need is manifest has been held to be objectively unreasonable.[23] *See, e.g.*, *Thompson*, 245 F.3d at 458 n.8; *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 474 (5th Cir. 1996). As the Third Circuit explained, "a reasonable [official] . . . could not believe that her actions comported with clearly established law while also believing that there is an excessive risk to the plaintiff[] and failing to adequately respond to that risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001). Naturally, therefore, "[i] is axiomatic that conduct which is deliberately indifferent . . . is *a fortiori* unreasonable." *Hollihan v. Pa. Dep't of Corr.*, No. 3:15-CV-5, 2016 U.S. Dist. LEXIS 6318, at *21, 2016 WL 235003, at *8 (M.D. Pa. Jan. 20, 2016). Whether or not a reasonable fact-finder would so conclude is irrelevant to the present dispute, for "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and

---

[22] "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mounce v. Doe*, No. 12-669, 2014 U.S. Dist. LEXIS 78920, at *65, 2014 WL 2587698, at *23 (E.D. La. June 10, 2014).

[23] It bears emphasis: unlike the deliberate indifference standard, particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity.

that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

Precisely because this determination is considered "a fact-intensive inquiry," courts have been reluctant to find the defense of qualified immunity proved on papers alone. *Dorsett-Felicelli v. Cnty. of Clinton*, 371 F. Supp. 2d 183, 193 (N.D.N.Y. 2005); *see also, e.g.*, *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 U.S. Dist. LEXIS 24366, at *18–19, 2004 WL 2781752, at *16 (S.D.N.Y. Dec. 2, 2004); *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000). Here, as in most cases, enough facts have been alleged to allow another to infer that Grimes and Gautreaux endorsed and adhered to a policy, whether written or not, or a course of conduct which traversed a well-established right with manifest indifference. At least for now, this conclusion forecloses the Natural Defendants' victory as to this defense.

### 4.  Plaintiffs' ADA Claim (Count Six)

Plaintiffs' ADA Claim, pled against Defendants[24] also survives the scrutiny required by Rule 12(b)(6). In light of this Rule's plausibility standard, for purposes of this claim's analysis, only a handful of factual allegations must be emphasized. Again and again, Cleveland and his family discussed his need for a wheelchair and certain medications. (Doc. 1 at 3–9; Doc. 45 at 3–9.) At his family's request, Cleveland's personal physician even provided a prescription in which these needs were affirmed and expressly stated. (Doc. 1 at 5; Doc. 45 at 5.) These complaints and requests were neither perfunctory nor infrequent; with every phone call by a daughter and a brother and every consultation with Cleveland, various officials at EBRPP and PMS were

---

[24] To repeat, the First and Second MTD are identical as to their attacks on the ADA, as are Plaintiffs' counters. *See supra* Part II.C.1, 2–4.

explicitly notified of Cleveland's particular requirements. (Doc. 1 at 3–9; Doc. 45 at 3–9.) Instead, Cleveland was placed on lockdown and on suicide watch at least once, while the surgery, medication, and device that he allegedly required was never offered, and his medical records not requested until the thirty-first day of his confinement at EBRPP. (Doc. 1 at 3–9; Doc. 45 at 3–9.) In addition, he was "shackled and handcuffed," and his weight—and, on one occasion, "a glitch in the paperwork"—served as the consistent pretext for his requested modifications' denial. (Doc. 1 at 5, 7; Doc. 45 at 5, 7.) With eminent plausibility, these threads can be weaved into a tapestry: in accordance with their policies and practices, Cleveland, a physically and mentally disabled individual, was "excluded . . . from participation in medical services because he was mobility impaired" and mentally ill by EBRPP, Grimes' and Gautreaux's agency, and PMS, (Doc. 13 at 18). Such allegations, if found true, would set forth a cognizable claim for either form of discrimination under the ADA. *See supra* Part III.A.4.

Of course, as Defendants rightly stress, "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010). So construed, the ADA is violated by a prison's or jail's failure to attend to the medical needs of its disabled inmates. *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 121, 123 (7th Cir. 1997) (as to Section 504); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (as to the ADA); *see also, e.g.*, *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006) (emphasizing that "courts have differentiated ADA claims based on negligent medical care from those based on discriminatory medical care"); *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001) ("[A] plaintiff's showing of medical unreasonableness . . . must be framed within some larger theory of disability discrimination."). As in the medical indifference cases, the ADA "does not create a remedy for medical malpractice," *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.

1996), and "purely medical decisions . . . do not ordinarily fall within the scope of the ADA or

the Rehabilitation Act," *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir.

2005).[25]

Despite this body of law, however, a contrary principle controls in accommodations

cases: in case after case, "the Fifth Circuit has held that a defendant's failure to make the

reasonable modifications necessary to adjust for the unique needs of disabled persons can

constitute intentional discrimination under the ADA." *Hacker*, 2016 U.S. Dist. LEXIS 73014, at

*40, 2016 WL 3167176, at *13 (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672

(5th Cir. 2004), and *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014)). As one court

explained, "failure to make reasonable accommodations to the needs of a disabled prisoner may

have the effect of discriminating against that prisoner because the lack of an accommodation

may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoner."

*McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 U.S. Dist. LEXIS 55403, at *23–24,

2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006); *see also United States v. Georgia*, 546 U.S.

151, 157, 126 S. Ct. 877, 880 –81, 163 L. Ed. 2d 650, 658 (2006). In fact, "where the defendant

otherwise had knowledge of the individual's disability and needs but took no action," not even

the failure to expressly request a specific accommodation (or modification) fatally undermines an

ADA claim. *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 296 (5th Cir. 2012);[26] *see*

*also Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL

---

[25] Although a number of these cases cite to the Rehabilitation Act of 1973 ("RA"), "[w]here a claim is based on the failure to provide reasonable accommodations, the ADA and RA are identical in scope." *Godbey v. Iredell Mem'l Hosp., Inc.*, No. 5:12-cv-00004-RLV-DSC, 2013 U.S. Dist. LEXIS 117129, at *11 n.7, 2013 WL 4494708, at *3 n.7 (W.D.N.C. Aug. 19, 2013).

[26] Conversely, an individual with a disability does have the responsibility to inform the employer that an accommodation is needed in the employment context. *See Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

327508, at *9 (N.D. Tex. Jan. 26, 2015); *Hinojosa v. Livingston*, 994 F. Supp. 2d 840, 843–44 (S.D. Tex. 2014).

Here, in their Complaints' first ten pages, Plaintiffs allege that a request for a modification, i.e. wheelchair, was made but ignored, Cleveland thereby finding himself denied access to existing EBRPP and PMS programs. Without an iota more of evidence, such allegations lend plausibility to his mobility-related ADA claim. *See Crowe v. Miss. Div. of Medicaid*, No. 3:11-CV-00366-CWR-LRA, 2012 U.S. Dist. LEXIS 131300, at *16, 2012 WL 4062798, at *3 (S.D. Miss. Sept. 14, 2012) (observing that "Congress expressly identified the 'failure to make modifications to existing . . . practices, exclusionary qualification standards and criteria, . . . and relegation to lesser services, programs, . . . benefits, or other opportunities' as forms of discrimination specifically targeted by the ADA").

For similar reasons, Plaintiffs' other ADA claim—that Cleveland "was discriminated against on the basis of his mental illness disability," (Doc. 13 at 18)—survives. To establish a cause of action for discrimination under the ADA, a plaintiff must show that he is a qualified individual with a disability, that he was excluded from participation in, or denied the benefits of, an available service, program, or activity, and that such exclusion or denial was by reason of his disability. *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000); *Pena v. Bexar Cnty.*, 726 F. Supp. 2d 675, 683 (W.D. Tex. 2010). Here, based on the Complaints' allegations, every element of this cause of action can be found. On multiple occasions, Cleveland and his family explained his mental disabilities to EBRPP and PMS; their existence was, in turn, documented in these entities' files—and those maintained by Cleveland's own doctor. (Doc. 1 at 3–9; Doc. 45 at 3–9.) Despite this purported knowledge, Defendants did not provide Cleveland with treatment appropriate for the bipolarity and schizophrenia documented in these documents, not to mention

his own doctor's written prescription. Doc. 1 at 3–9; Doc. 45 at 3–9.) Even so, he was allegedly placed in lockdown for his "bizarre and abnormal behavior" and "shackled and handcuffed all day" more than once. (Doc. 1 at 4–5; Doc. 45 at 4–5.)

If he or she finds these allegations satisfactorily proved, a reasonable factfinder could readily attribute knowledge of Cleveland's mental disabilities to Defendants and find that PMS, Grimes, and Gautreaux failed to properly treat Cleveland's longstanding problems. Having precluded him from participating in other programs by virtue of his disability as a matter of a policy that they adopted (or did not change), Defendants would thereupon be liable for disability discrimination. In short, based on their allegations, Plaintiffs have put forward a case sufficiently plausible to withstand Rule 12(b)(6)'s challenge.

## IV.    CONCLUSION

With Plaintiffs' pleadings containing allegations sufficient to support their constitutional and statutory counts, Rule 12, holistically construed, forbids this matter's dismissal. A plausible case, in other words, has been set forth with more than the minimal particularity required by rule and precedent. Accordingly, this Court DENIES the Motions to Dismiss, (Docs. 7–8).

Signed in Baton Rouge, Louisiana, on August 1, 2016.

JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA