# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**PAUL A. CLEVELAND, ET AL.,**

**VERSUS**

**SID GAUTREAUX, III,**
**SHERIFF, ET AL.**

**CV. NO. 15-744-JWD-RLB**

**JUDGE JOHN W. deGRAVELLES**

## RULING AND ORDER

### I.    INTRODUCTION

Before the Court are three Motions for Summary Judgment.  The first Motion was filed by Defendant Charlie Bridges, M.D.  (Doc. 104).  Plaintiffs Paul A. Cleveland, Paris LeBlanc, and Mindy Capello ("Plaintiffs") have filed an Opposition, (Doc. 117), and Bridges has filed a Reply in further support of his Motion, (Doc. 124).

The second Motion was filed by Defendants Linda Ottesen, Michelle Antoine, Ebony White, Lillian Bell, Kimberly Bates, and Prison Medical Services ("PMS," and, collectively with Ottesen, Antoine, White, Bell, and Bates, "the PMS Defendants").  (Doc. 105).  Plaintiffs have filed an Opposition, (Doc. 113), and the PMS Defendants have filed a Reply in further support of their Motion, (Doc. 123).

The third Motion was filed by Defendants Sid Gautreaux, III, Dennis Grimes, Anthony Williams, Richard Camp, Larry Turner, and Jasmyn Cage (collectively, "the Sheriff Defendants"). (Doc. 108).  Plaintiffs have filed an Opposition, (Doc. 119), and the Sheriff Defendants have filed a Reply in further support of their Motion, (Doc. 127).

The Court has considered the arguments of the parties. For the following reasons, Bridges's Motion will be granted, and the other two Motions will be granted in part and denied in part.

## II.     FACTUAL BACKGROUND

Paul R. Cleveland ("Cleveland") was a detainee at the East Baton Rouge Parish Prison ("EBRPP") between September 19, 2014, and November 12, 2014. (*See* Doc. 104-4 at 1-8, 119). On his first day in prison, Cleveland completed an Inmate Processing Face Sheet and Health Assessment with the assistance of Bell, a nurse. (*See* Doc. 104-4 at 10-11). According to the Face Sheet, Cleveland had manic depression and bipolar disorder and was taking Cymbalta and Seroquel. (Doc. 104-4 at 10). The Health Assessment stated that Cleveland had diabetes, high blood pressure, pain or pressure in his heart, rheumatoid arthritis, left leg trouble, recurrent back trouble, blood in his urine, a removed gallbladder, frequent or painful urination, thoughts of suicide, sleep apnea, peripheral artery disease, and spinal stenosis. (*See* Doc. 104-4 at 11).

Bell completed an additional intake questionnaire concerning Cleveland on September 20, 2014. (Doc. 104-4 at 1-8). The questionnaire stated that Cleveland had diabetes, high blood pressure, pain or pressure in his heart, arthritis, foot trouble, recurrent back trouble, gall bladder trouble, sleep apnea, peripheral artery disease, and spinal stenosis. (Doc. 104-4 at 4-5).

As part of the intake process, Bell also completed a "blue sheet" of Cleveland's current medications. (Doc. 117-3 at 5-6).[1] Also in connection with the intake process, Bridges reviewed the list of Plaintiff's medications and stated that he needed to stay on all of his medications. (*See* Doc. 117-2 at 8-9; Doc. 104-4 at 19).

---

[1] When citing deposition transcripts, the Court uses the continuous pagination provided by its ECF system and not the document's internal pagination.

A prison medical log shows that Cleveland was seen on September 22, 2014 for chest pain, (Doc. 119-30 at 2), but it does not appear that there is a corresponding medical treatment note for that visit.

Also on September 22, 2014, LeBlanc, one of Cleveland's daughters, spoke with Ottesen. (Doc. 104-4 at 154). LeBlanc told her that Cleveland had been in mental facilities four times; tried to commit suicide twice; had heart problems, hypertension, and diabetes; and "[got] pneumonia easy." (Doc. 104-4 at 154). Ottesen said that Cleveland would not give staff permission to speak with anyone about his medical care, but Ottesen would pass the information along to the nursing staff. (Doc. 104-4 at 154). According to LeBlanc's deposition testimony, she also discussed Cleveland's medications with Ottesen and requested that he be given a wheelchair. (Doc. 119-3 at 4-7, 18). LeBlanc says that she later reiterated her request for a wheelchair during a second, third, and fourth conversation with Ottesen. (Doc. 119-3 at 6, 18-19). In September 2014, during one of the subsequent calls, LeBlanc also informed Ottesen that Cleveland was having difficulty walking and complaining of chest pain. (Doc. 119-3 at 9, 19).

Bridges examined Cleveland on September 24, 2014, as new admittees to EBRPP "automatic[ally]" receive a physical examination. (Doc. 104-4 at 13; Doc. 117-2 at 15-17). Bridges completed a Physical Examination form in connection with that visit; its findings were generally unremarkable. (Doc. 104-4 at 13). Bridges testified at a deposition, however, that it was "obvious" that Cleveland had hypertension and heart disease based on the medications that he was taking. (Doc. 117-2 at 17).

On or about September 30, 2014, LeBlanc called Grimes, the warden of EBRPP, to say that her father had fallen because he was having trouble walking and standing and requested that

he be referred to a hospital; Grimes reportedly told her "there was nothing he could do about it" and it was not "his jurisdiction."  (Doc. 119-3 at 11-12, 20).

On October 1, 2014, Cleveland's son brought a wheelchair to EBRPP, along with a letter from Cleveland's primary care physician asking that Cleveland be permitted to use the wheelchair because he was "unable to walk long distances due to his extensive health history."  (Doc. 117-5 at 2-4; Doc. 104-4 at 26, 136, 153).  EBRPP guards turned Cleveland's son away; according to a chart note, a nurse told the guards that Cleveland could not have the wheelchair "if he did not come in with it, unless it ha[d] been approved by EBRPP MD."  (Doc. 117-5 at 4-6; Doc. 104-4 at 136, 153).

On October 2, 2014, and October 5, 2014, Cleveland completed three Medical Request Forms indicating, *inter alia*, that he was suffering from headaches and needed to be evaluated for heart surgery.  (Doc. 104-4 at 114-16).  Bell referred Cleveland's requests to a doctor.  (Doc. 104-4 at 114-16).  Cleveland's appointment was later rescheduled or canceled with the notation "rescheduled appointments."  (Doc. 119-9 at 1).  It is unclear when or whether the appointment occurred.

On October 6, 2014, Cleveland was seen as a "medical emergency" due to a boil on his arm; the Emergency Medical Request Form also noted that Cleveland was refusing his blood pressure medication "because of walking in pain."  (Doc. 104-4 at 113, 123).

On October 12, 2014, Cleveland completed a Medical Request Form asking to see a psychiatrist for "medication to help with sleep."  (Doc. 104-4 at 112).  On October 14, 2014, Cleveland met with Dr. Rani Whitfield regarding his headaches, heart surgery, request for a wheelchair, and psychological problems.  (Doc. 104-4 at 142).  Whitfield explained that most of Cleveland's requests could not be accommodated without medical records but referred Cleveland

to a psychiatrist and made notes stating "[m]edical record release" and "medical released [sic] form signed to be sent to Dr. Bunnie Hill." (Doc. 104-4 at 142-43).

On October 16, 2014, Cleveland completed a Refusal of Medical Care form, which stated that he had refused care because "the pain from walking [was] to[o] extreme with no wheelchair." (Doc. 104-4 at 128). On October 19, 2014, an Emergency Medical Request form was completed for Cleveland; it stated that he was suffering from pain in his buttocks and legs, difficulty walking, and shortness of breath. (Doc. 104-4 at 122). A chart note from that date states that Cleveland had not been to pill call for several days because "he [was] hurting to[o] bad" to go.[2] (Doc. 104-4 at 139). Cleveland was placed on a suicide watch because he had stated that he "would be better off dead" and because his refusal to take medication was "abnormal" and "bizarre." (Doc. 104-4 at 122; Doc. 119-10 at 6).

On October 20, 2014, Cleveland was being escorted to the medical department as a "medical emergency" with complaints of chest pains; while on his way, he stated that he could not go farther and asked for a wheelchair. (Doc. 104-4 at 150-51). When medical staff arrived at the scene, Cleveland said that his chest pains were "getting better," and he later denied that he was suffering from chest pain. (Doc. 104-4 at 151).

In a grievance form apparently received by EBRPP security on October 20, 2014 but dated in September, Cleveland complained that his heart valves were over 60% blocked, he was being forced to walk with his illnesses, and he was being subjected to substantial risk of injury and pain. (Doc. 119-8 at 12, 23). Cleveland requested a wheelchair, stronger pain medications, and to visit a heart doctor, vascular doctor, spinal doctor, and eye doctor. (Doc. 119-8 at 23). In a response dated October 21, 2014, Ottesen stated that Cleveland's grievance was unfounded; Ottesen

---

[2] Inmates at EBRPP receive medications at pill call, where inmates stand in line and receive their pills on a first come, first served basis. (Doc. 117-6 at 3-4). Pill call can take up to three hours. (Doc. 117-6 at 3).

recounted some of the medical care that Cleveland had received and stated that, that day, Ottesen had faxed a request for medical records to Cleveland's primary care physician. (Doc. 119-8 at 22). Ottesen's response said that a determination of Cleveland's care needs would be made following the receipt of his records. (Doc. 119-8 at 22).

On October 21, 2014, Grimes contacted PMS in response to a call from Cleveland's brother and asked why Cleveland was on suicide watch. (Doc. 119-11 at 13-14, 35). A PMS staffer advised that Cleveland had been evaluated and taken off suicide watch. (Doc. 119-11 at 35).

On October 22 and 23, 2014, Cleveland completed Emergency Medical Request forms complaining of chest, neck, side, and lower back pain. (Doc. 104-4 at 120-21). Whitfield saw Cleveland on October 28, 2014, but did not treat him because he was "disrespectful and belligerent" and referred him to Bridges. (Doc. 104-4 at 142).

Bridges examined Cleveland on October 29, 2014. (Doc 104-4 at 9; Doc. 117-2 at 19). At that time, Bridges noted that Cleveland had "multiple complaints," including chronic back pain, but was alert and oriented with "normal" extremities. (Doc 104-4 at 9; Doc. 117-2 at 19-20). According to Bridges's deposition testimony, he never spoke with Cleveland "about a wheelchair," and his testimony was based solely on his notes, which "speak for themselves." (Doc. 117-2 at 18, 20, 22-23). Bridges testified, however, that Cleveland was ambulatory, without any signs of acute distress, and a wheelchair would not have been clinically necessary had he discussed the issue with Cleveland at the time. (Doc. 117-2 at 22-24). Bridges confirmed that prior forms, including the initial Face Sheet and Health Assessment, the October 16 Refusal of Medical Care form, and the October 19 Emergency Medical Request form would have been printed out and placed in Cleveland's chart before the October 29, 2014 visit. (Doc. 117-2 at 26-27). Bridges also

stated that he considered chart notes in examining inmates but would still "go by" his own evaluation. (Doc. 117-2 at 24-25).

Cleveland later filed a grievance regarding an October 29 medical appointment, stating that an unspecified doctor had told him that he "didn't need [a] wheelchair" and that he was "out of shape and overweight." (Doc. 117-9 at 10).

On November 8, 2014, Cleveland completed another Medical Request Form, complaining of chest pain and requesting nitroglycerin. (Doc. 104-4 at 111).

On November 10, 2014, around 8:30 A.M., Cleveland was seen on an emergency basis because he had fainted "for a minute" after becoming "very dizzy and nauseated" while trying to use the restroom. (Doc. 104-4 at 147). Cleveland presented with a half-inch laceration to his head and bruised forehead. (Doc. 104-4 at 147). White placed Cleveland on the "MD call out" list. (Doc. 104-4 at 147). White believed that Cleveland should see "the next available physician" and did not think he was "faking it." (Doc. 119-7 at 15-19).

On November 10, 2014, around 4:10 P.M., Cleveland reported to White that he believed he was going to faint and "demand[ed]" to go to the hospital for evaluation. (Doc. 104-4 at 146). White advised Cleveland that he was in no "acute distress" and would be placed on the next available "call out." (Doc. 104-4 at 146). Cleveland denied having chest pains. (Doc. 104-4 at 146). Cleveland was placed in the "medical tank" for observation and would be assigned to a single cell "for safety." (Doc. 104-4 at 146-47). While in the "medical tank," Cleveland banged on the windows and was "very argumentative." (Doc. 104-4 at 146).

On November 10, 2014, around 4:55 P.M., LeBlanc called Grimes to report that her father was having a "heart attack," to request that he be transferred to a hospital, and to tell Grimes that she would "hold him personally responsible" if anything happened to Cleveland. (Doc. 119-3 at

13-15, 21). Cleveland's brother called Grimes around the same time to say that Cleveland was "having a heart attack" and "possibly dying"; Grimes allegedly said "we've had this conversation before" and that he had no "authority or jurisdiction" over "the medical." (Doc. 119-22 at 6-7). Cleveland's brother similarly told Grimes that he would hold Grimes responsible if anything happened to Cleveland. (Doc. 119-22 at 8). In Grimes's note memorializing this conversation, Grimes stated that he checked on Cleveland's status following the call and asked an unidentified nurse whether he needed to go to the hospital. (Doc. 119-11 at 35-36). The nurse reported that Cleveland was stable and "just [didn't] want to walk that far." (Doc. 119-11 at 35-36). Cleveland's brother and Grimes had spoken at some point previously about Cleveland's care, and Grimes had also told him then that he had no authority over the medical department. (Doc. 119-22 at 9).

Although the underlying records were somewhat unclear as to the extent of any "treatment" provided, Bates appears to have participated in Cleveland's treatment on November 10 and 11, 2014. (Doc. 119-12 at 6-14, 16; Doc. 113-12 at 1). Bates generally testified that, at most, she accompanied White, the assigned nurse, or took Cleveland's vital signs. (Doc. 119-12 at 13). Bates spoke with LeBlanc on November 11, 2014, concerning the identities of the physicians who were caring for Cleveland. (Doc. 113-11 at 15-16). LeBlanc asked Bates to take Cleveland to the hospital, and Bates said there was "nothing [on Cleveland's EKG] to send him on." (Doc. 113-11 at 17).

In a November 11, 2014 email addressed to Grimes, another member of Cleveland's family stated that she and her family were "concerned [Cleveland] is not well and not receiving sufficient medical care." (Doc. 115-28 at 5). It appears that the family member received a "read receipt" the same day, (Doc. 115-28 at 6), but there is no response to the email in the record.

Camp was assigned to the night shift on November 11, 2014; when he arrived, the log book stated that Cleveland had had a medical emergency that morning, and the daytime deputy also reported that Cleveland had just returned from the medical department and Camp should "keep an eye on him," although he did not explain why. (Doc. 119-13 at 3-4, 23).

That evening, Camp and Bell made rounds in the lockdown unit, handing out medication to inmates. (Doc. 119-13 at 6-7). Bell twice told Cleveland to get his medication, but Cleveland would not leave his bed, stating that he was too weak to get up. (Doc. 119-13 at 6-7). The second time Bell told Cleveland to get his medication, she told Cleveland to "stop playing" and that there was "nothing wrong with him." (Doc. 119-13 at 7). About three hours later, Bell returned and asked Camp how Cleveland was. (Doc. 119-13 at 8). Camp reported that he "seem[ed] to be sleeping" but had been turning over in his bed, occasionally hitting the wall with his fist. (Doc. Doc. 119-13 at 8-9). Bell said "okay" and went back to the medical department. (Doc. 119-13 at 9). Bell noted completing a "[l]ockdown/trusty sickcall" around that time. (Doc. 113-16 at 1-2).

While making rounds later on, Camp saw that Cleveland had defecated on himself and was lying naked on the floor on top of his jumpsuit. (Doc. 119-13 at 10-11). Cage and Turner came to the cell. (Doc. 119-13 at 10). Cleveland was ordered to come to the bars so that his cell could be cleaned, but Cleveland laid on the floor and said that he was "tired." (Doc. 119-13 at 10). Camp and Williams, who was also present, entered the cell and helped Cleveland up on the bed. (Doc. 119-13 at 10). Cleveland's mattress and jumpsuit were removed from the cell, and Cleveland was given a new jumpsuit and the opportunity to shower, which he declined. (Doc. 119-13 at 10-11). Camp reported to the medical department that Cleveland had defecated on himself and was "weak." (Doc. 119-13 at 17-18). Cage's deposition testimony was generally consistent with Camp's account. (Doc. 119-17 at 2-13). Cage also contacted the medical

department; he spoke with Bell who, according to Cage, said that Cleveland was "faking" and trying to get back to the infirmary. (Doc. 119-17 at 13-14). Cage also reported the incident and the medical department's response to Turner, her supervisor, who responded "okay." (Doc. 119-17 at 15). Cage did not believe that Cleveland was faking but reported that, in this situation, the medical department's decision was final. (Doc. 119-17 at 14-15). At his own deposition, Turner testified that he did not believe that Cleveland was "faking," but he was unable to instruct medical staff to call an ambulance because, according to his "training," medical staff makes that decision. (Doc. 119-18 at 11-13).

At about 4:05 A.M., Camp found Cleveland unresponsive in his cell while passing out trays for chow. (Doc. 119-13 at 19-20). Camp, Turner, and Williams performed CPR to no avail. (*See* Doc. 119-13 at 20).

On November 13, 2014, Ottesen answered Cleveland's grievance against Bridges, stating that the grievance was unfounded because "[t]he doctor examined [Cleveland] and did not see a medically necessary reason for a wheel chair" and that Cleveland's request would be re-evaluated after the receipt and review of past medical records. (Doc. 117-9 at 11).

Dr. Yen Van Vo conducted Cleveland's autopsy. (Doc. 119-20 at 2). She found, *inter alia*, that Cleveland suffered from hemorrhagic ulcers in his digestive tract and collected about 350 milliliters of blood from his digestive tract. (Doc. 119-20 at 9, 11). Vo determined that the cause of Cleveland's death was hypertensive and atherosclerotic cardiovascular disease and that the hemorrhagic gastroenteritis Vo observed was due to "lack of oxygen reaching the intestinal tract." (Doc. 119-20 at 13, 15).

At his deposition, Dr. Steve Womack, Plaintiffs' expert, offered an opinion that, had Cleveland been sent to the emergency room on November 10 or 11, 2014, he would have survived the night. (Doc. 115-24 at 2-3).

During his deposition, Grimes testified that, with respect to prison medical care, his "job" is to "get [inmates] [. . .] in front of the medical staff," and it is the medical staff's job to ensure that treatment is adequate. (Doc. 119-11 at 4). If medical staff report that an inmate is "fine," Grimes is "done." (Doc. 119-11 at 11).

In 2015 and 2016, the Baton Rouge Metro-Council conducted an investigation of the availability of medical care at EBRPP. In connection with that investigation, the Metro-Council hired Health Management Associates ("HMA") to evaluate PMS and compare its procedures to national standards. (Doc. 119-27 at 3-4; Doc. 119-31 at 1-7). In part, the evaluation found: (1) "[i]nconsistent practices observed by LPNs completing screening and time available by physicians"; (2) sick call slips were not "readily available" and had to be requested from officers; (3) "long waits" for specialty care; (4) policies and procedures were not readily available or known to staff, and most staff reported that they were unaware that policies and procedures existed, putting detainees at "significant risk"; (5) "22% missed med passage [was] high"; (6) length of time (24-36 hours or more) detainees sometimes spent in central booking was "not acceptable" and created potential for individuals with acute or chronic conditions to miss medications or delay treatment; (7) the number of patients scheduled for sick call was "very low" and constituted "diminished access to care"; and (8) chronic care did not "appear to follow any clinical guidelines or meet community or [national] standards." (Doc. 119-26 at 1, 3, 18, 22, 28-30, 33).

### III.    LEGAL STANDARDS

#### a.  General Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

#### b.  The Court's Prior Ruling

In August 2016, the Court denied Motions to Dismiss filed by Grimes, Gautreaux, and PMS.  *See Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 725 (M.D. La. 2016), *appeal dismissed* (Oct. 26, 2016).  Though the procedural and evidentiary standards applicable to the instant Motions for Summary Judgment are different from those that were applicable to the Motions to Dismiss,

the substantive standards under which the underlying claims are analyzed remain largely the same.

The Court set forth many of these general standards in the following excerpts:

### Plaintiffs' Constitutional Claims

The constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment. *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999). Such constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a "condition of confinement" or as an "episodic act or omission." *Shepherd v. Dallas Cnty.,* 591 F.3d 445, 452 (5th Cir. 2009); *see also Reed v. Wichita Cnty. (Estate of Henson)*, 795 F.3d 456, 464 (5th Cir. 2015) ("[T]here is no rule barring a plaintiff from pleading both alternative theories[.]"). "The Fourteenth Amendment requires that state officials not disregard the 'basic human needs' of pretrial detainees, including medical care." *Reed v. Krajca (Estate of Henson)*, 440 Fed. Appx. 341, 343 (5th Cir. 2011). Put differently, "the substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee." *Reed,* 795 F.3d at 462 (citing *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447, 466 (1979)). Any "punishment" of a pretrial detainee, therefore, will run afoul of the Constitution. *Duvall v. Dallas Cty., Tex.,* 631 F.3d 203, 206 (5th Cir. 2011).

As *Reed* explains, "challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Reed,* 795 F.3d at 463 (quoting *Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 644 (5th Cir. 1996)). Though courts "routinely rejected conditions of confinement claims well into ... [the 20th] century," *Helling v. McKinney,* 509 U.S. 25, 39, 113 S.Ct. 2475, 2484, 125 L.Ed.2d 22, 35 (Thomas, J., dissenting) (internal quotation marks omitted), no debate now beclouds their validity, *see Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156, 167 (1992). Of course, the punitive and hence forbidden "conditions, practices, rules, and restrictions can be explicit." *Id.* (relying on *Shepherd,* 591 F.3d at 452). Yet, such a condition may also "reflect an unstated or de facto policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Id.* (alteration in original) (internal quotation marks omitted) (citing *Hare,* 74 F.3d at 644–45). Regardless, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* (internal quotation marks omitted) (citing *Bell,* 441 U.S. at 539, 99 S.Ct. 1861); *accord Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004).

Axiomatically, "[t]he medical care a prisoner receives is just as much a 'condition' of his [or her] confinement as the food he [or she] is fed." *Wilson v. Seiter,* 501 U.S.

294, 303, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271, 282 (1991). Furthermore, as a matter of law, "[a] State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction," and "even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." *Hare,* 74 F.3d at 644; *accord Reed,* 795 F.3d at 463. Consequently, "a true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation." *Hare,* 74 F.3d at 644–45. Though not expressly, "[t]he Fifth Circuit has at least suggested that condition-of-confinement claims are cognizable against individual actors only in their official capacities." *Nagle v. Gusman,* No. 12–1910 Section "R"(2), 2016 U.S. Dist. LEXIS 23747, at *16–17, 2016 WL 768588, at *5 (E.D.La. Feb. 26, 2016) (collecting cases).

In contrast, "where the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an episodic act or omission case." *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997) (internal quotation marks omitted). The relevant question now "becomes whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge, and intentionality is no longer presumed." *Reed,* 795 F.3d at 463 (internal quotation marks omitted) (citing *Hare,* 74 F.3d at 645). For such a violation to be found, the official must have "subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference." *Hare,* 74 F.3d at 650. Generally, "[d]eliberate indifference is shown when the official knows of and disregards an excessive risk to inmate health or safety," and "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Reed,* 440 Fed.Appx. at 343. Per binding precedent, "proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is *normally* required before such lack of training or supervision constitutes deliberate indifference." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir.2001) (emphasis added). Frequently, "a plaintiff must demonstrate a pattern of similar incidents in which the citizens were injured." *Snyder v. Trepagnier,* 142 F.3d 791, 798 (5th Cir.1998). Just as clearly, "the inadequacy of training must be obvious and obviously likely to result in a constitutional violation." *Thompson,* 245 F.3d at 459. "Negligence or even gross negligence is not enough." *Campos v. Webb Cnty.*, 597 Fed.Appx. 787, 792 (5th Cir. 2015) (citing to *Hare,* 74 F.3d at 650). But, deliberate indifference does exist "where a plaintiff shows that officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985) (internal quotation marks omitted). . . .

**Municipal Liability**

Named after the famed case that first recognized it, *Monell v. Dep't. of Social Services,* 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978), *Monell* liability requires proof of four elements: (1) a policymaker; (2) an official policy; (3) a constitutional violation; and (4) a violation of that constitutional right whose "moving force" is "the policy or custom," *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001) (construing (3) and (4) as one element). Stated differently, "[a] plaintiff must point to a persistent and widespread practice[] of municipal [or state] officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference"; as such, knowledge and indifference, factors incorporating subjective and objective components, are required, as is an actual threshold constitutional violation. *Owens v. Balt. City State's Attys. Office,* 767 F.3d 379, 402–03 (4th Cir.2014); *see also, e.g.,* *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) ("The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." (internal quotation marks omitted)); *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir.2005) (enumerating the pertinent elements).

*Monell* "presupposes a conscious adoption of a course of action 'from among various alternatives.'" *Shadrick v. Hopkins County, Ky.,* 805 F.3d 724, 752 (6th Cir. 2015). The practice that it and its progeny forbid, moreover, must be "so persistent and widespread and so permanent and well settled as to constitute a custom or usage with *the force of law,* " *Moody v. City of Newport News,* 93 F.Supp.3d 516, 542 (E.D.Va.2015) (emphasis added). It is, as the Fifth Circuit has emphasized, "difficult to prove," *Anderson v. Marshall Cnty., Miss.,* 637 Fed.Appx. 127, 133 (5th Cir.2016), though some circuits permit trial courts to infer the requisite knowledge and indifference from a proven record of "widespread or flagrant violations," *Owens,* 767 F.3d at 403 (internal quotation marks omitted).

**ADA**

Under well-established precedent, a prisoner may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act ("RA"). *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 209–10, 118 S.Ct. 1952, 1954–55, 141 L.Ed.2d 215 (1998); *see also, e.g.,* *Frame v. City of Arlington,* 657 F.3d 215, 224–25 (5th Cir. 2011). Title II prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state penal institutions like EBRPP fall squarely within this statutory definition, *see Yeskey,* 524 U.S. at 210, 118 S.Ct. 1952. As a general matter, a plaintiff proceeding under Title II must "show that: (1) he or she is a 'qualified individual with a disability'; (2) he or she is being

excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity." *Douglas v. Gusman,* 567 F.Supp.2d 877, 889 (E.D.La. 2008).

Notably, while the ADA's reasonable accommodation requirement does not apply under Title II, its "reasonable modifications" requirement—"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7); *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)—has been held to apply in the prison context. *Garrett v. Thaler,* 560 Fed. Appx. 375, 382 (5th Cir. 2014). This distinction has two consequences. Overall, the ADA "does not require prisons to provide *new* services or programs for disabled prisoners." *Borum v. Swisher Cnty.*, No. 2:14–CV–127–J, 2015 WL 327508, at *9 (N.D.Tex. Jan. 26, 2015) (emphasis added). However, these same entities "do have an affirmative obligation to make reasonable modifications ... so that a disabled prisoner can have meaningful access to *existing* public services or programs." *Id.* (emphasis added).

Directly relevant to the Parties' instant dispute, the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA. *See, e.g.*, *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler,* 560 Fed. Appx. 375, 382 (5th Cir. 2014). No requirement for a showing of an intentional harm has yet been appended to either statute by other circuits. *E.g., Liese v. Indian River Cnt. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). As a result, in the context of the ADA, if not for purposes of the Eighth Amendment, "intentional discrimination against the disabled does not require personal animosity or ill will"; "it may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy ... or custom." *Bartlett v. N.Y. State Bd. of Law Examiners,* 156 F.3d 321, 331 (2d Cir.1998). As such, based on much precedent, the failure to provide a disabled inmate with access to existing modifications can be held to violate the ADA's second title. *See, e.g., McCoy v. Tex. Dep't of Crim. Justice*, No. C–05–370, 2006 WL 2331055, at *7 (S.D.Tex. Aug. 9, 2006) ("In the prison context, ... failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners.").

*Cleveland*, 198 F. Supp. 3d at 733–37.

### c. Qualified Immunity

As discussed *infra*, the Motions for Summary Judgment raise qualified immunity as a

defense.  As the Fifth Circuit has explained:

> The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). We must determine (1) "whether the facts that a plaintiff has alleged ... make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* "A right may be clearly established without 'a case directly on point,' but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017) (quoting *White v. Pauly*, ––– U.S. –––, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017)). . . . Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S.Ct. 808. However, deciding the two prongs in order "is often beneficial." *Id.*
>
> Once an official pleads qualified immunity, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Still, at the summary judgment stage, we must "view the facts in the light most favorable to ... the nonmoving party." *City & Cty. of San Francisco v. Sheehan*, ––– U.S. –––, 135 S.Ct. 1765, 1769, 191 L.Ed.2d 856 (2015). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 (5th Cir. 2018); *see also Malley v. Briggs*,

475 U.S. 335, 341 (1986) (qualified immunity "provides ample protection to all but the plainly

incompetent or those who knowingly violate the law").

## IV. THE PARTIES' ARGUMENTS

### a. Bridges's Motion

The operative Second Amended Complaint lists six "counts"[3] against the various defendants in this case. The two against Bridges challenge his alleged decision to deny Cleveland access to a wheelchair, which in turn allegedly denied Cleveland access to medication. (Doc. 87 at 16-19). Plaintiffs also assert that Bridges knew of Cleveland's heart condition, chest pain, and lack of access to medication, but refused him access to a wheelchair and other medical care and ignored his symptoms. (*Id.* at 18).

In his Motion for Summary Judgment, Bridges argues principally that Plaintiffs have failed to raise a genuine dispute as to whether Cleveland actually needed a wheelchair and whether Bridges recognized this need and nevertheless denied Cleveland access to a wheelchair. (Doc. 104-1 at 11-12). Bridges further argues that Plaintiffs' expert has offered no opinion concerning the use of a wheelchair, and, according to Bridges, Plaintiffs have offered "nothing" to contradict Bridges's statement that Cleveland did not need a wheelchair or that Cleveland should walk rather than use a wheelchair. (*Id.* at 12). Bridges also observes that Cleveland's primary care provider and Plaintiffs' expert have not faulted Bridges for failing to provide a wheelchair, (*see* Doc. 104-13 at 2; Doc. 104-14 at 2), and there is no suggestion that Cleveland used one prior to his admission to EBRPP. (Doc. 104-1 at 12-15). Bridges also states that no expert has opined that not receiving his medications "on occasion" caused Cleveland's health to deteriorate and that a prisoner cannot be forced to take his medications. (*Id.* at 15-16). Finally, Dr. Bridges asserts that he is entitled to qualified immunity for substantially the same reasons underlying his other arguments. (*Id.* at 16-18).

---

[3] The Second Amended Complaint numbers the counts as Counts One through Seven, but Count Five appears to be missing. (Doc. 87 at 11-22).

Plaintiffs oppose, observing that, when Bridges saw Cleveland on October 29, 2014, he had previously signed off on Cleveland's medications and he had access to Cleveland's medical file, which contained information about Cleveland's medical history, his refusal of medication due to difficulty walking, and his emergency visit for shortness of breath and difficulty walking. (Doc. 117 at 7). Plaintiffs also argue that a dispute exists regarding whether Bridges denied Plaintiff a wheelchair because "his doctors were killing him" and he was "overweight." (*Id.*). Plaintiffs argue that the pain that Cleveland suffered from being denied a wheelchair was "substantial harm" and "infliction of unnecessary suffering" that can give rise to legal liability. (*Id.* at 8). Finally, Plaintiffs state that Bridges was a private contract physician not entitled to qualified immunity. (*Id.* at 8-9). In discussing the applicable legal standard, they also argue that the law in this area is "well and clearly established." (*Id.* at 6).

In reply, Bridges generally reiterates arguments previously made and disputes whether he is entitled to qualified immunity. (Doc. 124 at 1-5). Bridges also emphasizes that any mention he made of Plaintiff's weight does not evidence animus but a medical judgment that patients with Cleveland's problems should "get up and walk around and not become sedentary." (*See id.* at 4).

### b. The PMS Defendants' Motion

Plaintiffs allege three "counts" against the PMS Defendants. First, Plaintiffs contend that, like Bridges, Ottesen denied Cleveland access to a wheelchair, which in turn allegedly denied Cleveland access to medication at pill call. (Doc. 87 at 16-17). Second, Plaintiffs allege that all of the PMS Defendants (aside from PMS itself) demonstrated deliberate indifference to Cleveland's serious medical needs in denying him access to a wheelchair and adequate healthcare. (*Id.* at 18-19). Third, Plaintiffs raise an Americans with Disabilities Act ("ADA") claim against PMS. (*Id.* at 19-20).

The PMS Defendants move for summary judgment, arguing first that Ottesen was not a heathcare provider, but only a hospital administrator, and did not prescribe medication or care or determine "what items may be clinically needed." (Doc. 105-1 at 3, 5; *see also id.* at 10 (Ottesen is not alleged to have had "any role in the clinical aspects of [Cleveland's] care")). Second, the PMS Defendants argue that Cleveland had no medical need for a wheelchair and, "[u]ntil [Cleveland] was evaluated by a physician, who was of the opinion that a wheelchair was necessitated, he was ineligible to obtain a wheelchair." (*Id.* at 6-7). Next, the PMS Defendants assert that Cleveland had access to his medications and, between November 1 and November 11, 2014, was 89% compliant with them. (*Id.* at 8-9). The PMS Defendants then argue that Antoine, White, Bates, and Bell provided care and were not deliberately indifferent to Cleveland's medical needs. (*Id.* at 9-12). With respect to Plaintiffs' ADA claim, the PMS Defendants argue that PMS made "every reasonable accommodation" to Cleveland's alleged disability. (*Id.* at 13-15). They contend that Bridges thought that a wheelchair was contraindicated and that Cleveland had access to his medication. (*Id.* at 14). They also argue that placement in a "single man cell" constitutes an accommodation. (*Id.*). The PMS Defendants also maintain that Ottesen, White, Bell, and Bates are entitled to qualified immunity from Plaintiffs' individual capacity claims and are immune from suit in their official capacities because their employer, PMS, is not an entity that can be sued and Plaintiff has failed to allege municipal liability by the proper defendant (the City-Parish of East Baton Rouge). (*Id.* at 15-18).

Plaintiffs do not oppose the entry of summary judgment in Antoine's favor. (Doc. 113 at 1 n.1). Otherwise, Plaintiffs oppose, first arguing (after a lengthy recitation of facts and legal standards) that Bell may be found liable because she was aware of Cleveland's chronic conditions and saw that he was too weak to get up to take his evening medications; she "mocked" him when

she witnessed his condition; she "falsely noted" that she had conducted a sick call; she accused Cleveland of "faking" without visiting Cleveland or conducting an exam; and she did not respond to Cage's request for medical assistance. (*Id.* at 17-18).

Plaintiffs argue that White may be found liable because, knowing of Cleveland's history of cardiac disease and multiple fainting episodes, she nevertheless assigned him to lockdown rather than give further treatment. (*Id.* at 19-20). With respect to Bates, Plaintiffs argue that she knew that Cleveland had recently lost consciousness and was suffering from chest pains; she failed to properly document her visits with Cleveland and his complaints; and LeBlanc told her that Cleveland needed to go to the hospital. (*Id.* at 20-21). Plaintiffs argue that Ottesen could be found liable because she knew that Cleveland "needed a wheelchair" from the beginning of his incarceration and "manufactured procedural pitfalls" to prevent him from getting one. (*Id.* at 23-24). Plaintiffs further argue that Bell, White, Bates and Ottesen acted unreasonably in light of clearly established law and are therefore not entitled to qualified immunity. (*Id.* at 24). Finally, Plaintiffs allege that PMS violated the ADA by refusing to provide Cleveland with a wheelchair to accommodate his limited ability to walk and with accommodations for his mental illness rather than placing him in lockdown. (*Id.* at 24-32).

In reply, the PMS Defendants generally reiterate arguments previously made, emphasizing the extent of the medical treatment that these Defendants provided during Cleveland's time at EBRPP. (Doc. 123 at 1-7).

### c. The Sheriff Defendants' Motion

All of Plaintiffs' "counts" are brought against one or more of the Sheriff Defendants. First, Gautreaux and Grimes are named in Plaintiffs' challenge to the conditions of confinement at EBRPP for detainees with "serious medical conditions," including peripheral artery disease. (Doc.

87 at 11-13). The same defendants are also named in a conditions-of-confinement challenge to EBRPP's services for detainees with serious mental illnesses, including bi-polar disease. (*Id.* at 13-15). Next, Plaintiffs claim that, like Bridges and Ottesen, Gautreaux and Grimes denied Cleveland access to a wheelchair, which in turn allegedly denied Cleveland access to medication at pill call. (*Id.* at 16-17). Plaintiffs also allege that all of the Sheriff Defendants demonstrated deliberate indifference to Cleveland's serious medical needs in denying him access to a wheelchair and adequate healthcare. (*Id.* at 18-19). Plaintiffs also raise an ADA claim against Gautreaux and Grimes in their official capacities. (*Id.* at 19-20). Finally, Plaintiffs raise state law wrongful death and survival claims against all of the Sheriff Defendants. (*Id.* at 21-22).

The Sheriff Defendants move for summary judgment on all claims. (Doc. 108-2 at 1). First, they claim that, according to Ottesen's deposition testimony, there were written procedures regarding on-site care and referrals to third-party medical providers in place at the relevant time. (*Id.* at 4). They also argue that neither Gautreaux nor Grimes were personally involved in providing care to Cleveland, and neither had access to his chart for confidentiality reasons. (*Id.* at 5). Additionally, in response to Cleveland's family members' concerns, Grimes contacted the medical department to check on Cleveland's status. (*Id.* at 5-6). The Sheriff Defendants similarly claim that they are not responsible for providing or approving the use of a wheelchair, and they argue that Cleveland was offered his medications while he was on lockdown status. (*Id.* at 6-7). The Sheriff Defendants also contend that Cleveland died of cardiovascular disease, not a heart attack as alleged in the Second Amended Complaint. (*Id.* at 7). With respect to the night and early morning immediately before Cleveland died, the Sheriff Defendants maintain that none of the responding officers perceived Cleveland to be at substantial risk of serious harm and, in any event, if they did, they referred the incident to the medical department. (*Id.* at 7-9, 34-36).

The Sheriff Defendants argue that Plaintiffs have made only "general conclusory allegations" in support of their "conditions of confinement" claims, reemphasizing the existence of policies regarding referrals to third-party providers and PMS's overall responsibility for providing medical care at EBRPP. (*Id.* at 19-23). The Sheriff Defendants argue that Plaintiffs' claims against Grimes and Gautreaux also fail under the "episodic acts or omissions" standard because neither provided medical care to Cleveland, Gautreaux did not have any personal knowledge of his situation, and Grimes contacted PMS when asked about the care that Cleveland was receiving and properly deferred to the judgment of medical professionals. (*Id.* at 25-33). With respect to Plaintiffs' ADA claims, the Sheriff Defendants reiterate that PMS provides medical care at EBRPP, and there is "no evidence" that any of them discriminated against Cleveland because of an alleged disability. (*Id.* at 37-40). Finally, the Sheriff Defendants contend that Plaintiffs' state law claims fail for many of the same reasons just discussed: *i.e.,* they did not breach any duty to Cleveland in providing him with medical care. (*Id.* at 40-43).

Plaintiffs do not oppose the grant of summary judgment in Gautreaux's favor "on the § 1983 Individual Capacity Claim." (Doc. 119 at 1 n.1). Plaintiffs otherwise oppose, arguing that, when Cleveland was found lying on the floor "covered in his own feces," too weak to get up, the seriousness of his medical condition was obvious, such that it may be inferred that Camp, Cage, Turner, and Williams knew that he was at substantial risk of serious harm. (*Id.* at 24-29). Plaintiffs also note that these Defendants actually contacted the medical department, and Camp was informed by the daytime deputy that he should keep a "close eye" on Cleveland. (*Id.*). Plaintiffs also argue that these Defendants cannot claim reliance on Bell's opinion, which was made without observing Cleveland. (*Id.* at 27-28). Plaintiffs further maintain that Grimes was informed of risks

to Cleveland by Cleveland's family members and that his "total reliance" on the opinion of the medical department amounted to deliberate indifference. (*Id.* at 29-30).

With respect to their "official capacity claims" of an unconstitutional municipal policy or practice, Plaintiffs contend that Camp, Cage, Williams, and Turner violated Cleveland's constitutional rights as set forth previously, and that the violations occurred because EBRPP "trains its employees to leave their humanity behind when they put on their uniform" and that they are "not allowed, under any circumstances, to use their own judgment when [PMS] is clearly not providing an inmate with adequate medical care." (*Id.* at 31-32). Plaintiffs contend that Gautreaux and Grimes are not free to abdicate their responsibility to provide adequate medical care as is required by the Constitution. (*Id.* at 33-34). Relatedly, under the heading "conditions of confinement," Plaintiffs contend that the record in this case is "replete with the known inadequacy" of the prison medical department, citing particularly the findings of the HMA evaluation. (*Id.* at 34-35).

Plaintiffs then argue that they have adequately supported an ADA claim, as (1) Cleveland had difficulty standing and walking, which constitutes a disability under the ADA; (2) Cleveland repeatedly informed EBRPP staff of his difficulty walking and requested a wheelchair; and (3) Cleveland suffered additional pain and punishment due to EBRPP's failure to accommodate his disability. (*Id.* at 38-39). Finally, Plaintiffs allege that their state law claims survive because they have presented many disputes of material fact about whether the Sheriff Defendants breached a duty to Cleveland. (*Id.* at 39-40).

In reply, the Sheriff Defendants reiterate many arguments previously made. (*See generally* Doc. 127). They emphasize that there is no evidence that Camp, Cage, Turner and Williams actually drew the inference of a serious risk of harm to Cleveland, as inmates defecating on

themselves was common and no officer saw blood in Cleveland's stool. (*Id.* at 7-9). The Sheriff Defendants also ask that the Court disregard any allegations of an official policy that officers are not allowed to "use their judgment when [PMS] is clearly not providing an inmate with adequate medical care," as this claim is not alleged in the Second Amended Complaint. (*Id.* at 11-12). In any event, the Sheriff Defendants argue that such a claim would fail because training that officers are to defer to medical professionals is "specifically allowed under the law." (*Id.* at 13).

The Sheriff Defendants also argue that Plaintiffs' conditions-of-confinement claims should not be considered because the HMA evaluation was not discussed in the Second Amended Complaint, the evaluation occurred in 2016 after Cleveland's death, and Plaintiffs do not show how the findings establish an unconstitutional condition that caused Cleveland's death. (*Id.* at 16-23). For example, they characterize Plaintiffs' claims as challenging "the medical decisions of physicians and nurses," not his ability to be seen by physicians. (*Id.* at 20). The Sheriff Defendants further argue that none of them deprived Cleveland of a wheelchair or intentionally discriminated against him based on a disability. (*Id.* at 23-24).

## V. DISCUSSION

### a. Section 1983 Claims against Bridges

As discussed *supra*, Bridges argues principally that there is no genuine dispute regarding whether Cleveland needed a wheelchair, whether Bridges recognized this need, and whether he denied Cleveland access to a wheelchair notwithstanding this need with deliberate indifference. Plaintiffs argue that Bridges had access to information about Plaintiff's serious conditions and pain while walking via charts and medical records and that LeBlanc's deposition testimony and Cleveland's grievance suggest that he discussed getting a wheelchair with Bridges, who told him

that his "doctors were killing [him]," he did not need a wheelchair, and he was "out of shape" and "overweight." (Doc. 117 at 7-8).

The Court agrees with Plaintiffs that, viewed in the light most favorable to them, the record permits an inference that Cleveland and Bridges discussed a wheelchair. However, the same evidence states, in Cleveland's own words, that the request was denied because, in Bridges's opinion, Cleveland's doctors were "killing [him]," he did not need a wheelchair, and he was "out of shape" and "overweight." Even if indelicately phrased, this evidence at most permits a finding that Bridges's actions were based on a mistaken or unreasonable judgment about the beneficial versus deleterious effects of a wheelchair in light of Cleveland's overall medical condition. Such a finding is insufficient to support a deliberate indifference claim. *See Gobert v. Caldwell*, 463 F.3d 339, 346, 352 (5th Cir. 2006) (unsuccessful medical treatment, acts of negligence, medical malpractice, a prisoner's disagreement with his medical treatment, and a decision whether to provide additional treatment generally do not permit finding of deliberate indifference; reversing denial of summary judgment on facts that permitted finding of negligence but not of "egregious intentional conduct required to satisfy the exacting deliberate indifference standard"); *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (reversing denial of summary judgment and observing that deliberate indifference is "an extremely high standard to meet" and an "incorrect diagnosis," which in *Domino* resulted in failure to prevent prisoner's suicide, does not constitute deliberate indifference; rather, plaintiff must show that officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct "clearly evinc[ing] a wanton disregard for any serious medical needs"); *Wagner v. Bay City, Tex.*, 227 F.3d 316, 325 (5th Cir. 2000) (reversing order denying summary judgment and faulting district court for evaluating case "through the lens of 20/20 hindsight"; while court was "required to make

all reasonable inferences in favor of the non-movant," there was "simply a dearth of evidence suggesting that defendants had subjective knowledge of and a deliberate indifference to [arrestee's] needs"); *Zaunbrecher v. Gaudin*, 641 F. App'x 340, 346 (5th Cir. 2016) (factfinder might find that failure to read medical request forms prior to treatment, follow up with inmate, instruct guards to monitor inmate, and notify nurse practitioner of inmate's symptoms constituted "ill-advised decisions not to provide additional treatment or a failure to adhere to an appropriate standard of care," but could not find that these were "egregious intentional conduct" rising to level of deliberate indifference).

Plaintiffs are correct that deliberate indifference and a defendant's state of mind may be established by inference or circumstantial evidence. *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."). However, there is virtually no evidence pushing Bridges's actions, or the mental state that might be inferred from them, beyond the realm of negligence and malpractice to deliberate indifference. *See Leal v. Wiles*, ___ F. App'x ___, 2018 WL 2123264, at *5 (5th Cir. May 8, 2018) (affirming grant of summary judgment in officer's favor where there was no direct evidence of knowledge and "the circumstantial evidence d[id] not meet the high standard of deliberate indifference"); *see also Zaunbrecher v. Wiley*, 2015 WL 1247008, at *4 (M.D. La. Mar. 18, 2015), *rev'd and remanded sub nom. Zaunbrecher v. Gaudin*, 641 F. App'x 340 (5th Cir. 2016) (reversed opinion relying in part on *Farmer*'s language concerning circumstantial evidence).

Plaintiffs have not shown a genuine issue of material fact as to Bridges's denial of a wheelchair, and it is from this alleged denial that Plaintiffs' claims against Bridges arise. Bridges's Motion will therefore be granted.

### b. Section 1983 Claims against PMS Defendants

As discussed previously, the PMS Defendants contend that Ottesen is an administrator who was not involved in providing healthcare to Cleveland, Cleveland had no medical need for a wheelchair, Cleveland had access to his medication and was 89% compliant with his medication regimen, and there is no factual support for a finding of deliberate indifference as to any PMS Defendant. Plaintiffs oppose, first arguing that Bell may be found liable because she was aware of Cleveland's chronic conditions and saw that he was too weak to get up to take his evening medications; she "mocked" him when she witnessed his condition; she "falsely noted" that she had conducted a sick call; she accused Cleveland of "faking" without visiting Cleveland or conducting an exam; and she did not respond to Cage's request for medical assistance.

Plaintiffs argue that White may be found liable because, knowing of Cleveland's history of cardiac disease and multiple fainting episodes, she nevertheless assigned him to lockdown rather than give further treatment. With respect to Bates, Plaintiffs argue that she knew that Cleveland had recently lost consciousness and was suffering from chest pains; she failed to properly document her visits with Cleveland and his complaints; and LeBlanc told her that Cleveland needed to go to the hospital. Plaintiffs argue that Ottesen could be found liable because she knew that Cleveland "needed a wheelchair" from the beginning of his incarceration and "manufactured procedural pitfalls" to prevent him from getting one.

With respect to Ottesen, as the PMS Defendants correctly suggest, a deliberate indifference claim generally does not lie against an individual who has no role in an inmate's medical treatment,

including one who responds to medical grievances. *See Hall v. Wood*, 2016 WL 4620005, at \*5 (E.D. Tex. Aug. 10, 2016), *report and recommendation adopted,* 2016 WL 4595894 (E.D. Tex. Sept. 2, 2016) (plaintiff failed to show that defendant, "who was not a dentist and who merely responded to plaintiff's grievances, had any role in plaintiff's medical treatment"); *see also Cooper v. Johnson*, 353 F. App'x 965, 968 (5th Cir. 2009) ("As Practice Manager, Anaduaka had no authority to diagnose Cooper's medical condition or to determine whether Cooper could receive a hearing aid. Instead, his role was to review the medical record and explain application of UTMB-CMHC's policies to inmates. The record reflects that he fulfilled this duty."). Perhaps notably, Plaintiffs state that Ottesen told LeBlanc that she would need a prescription for a wheelchair, but, when a wheelchair was brought to EBRPP, "PMS" (not Ottesen herself) "denied Cleveland access." (Doc. 113 at 21).

More significantly, as was the case with Bridges, there is virtually no evidence suggesting that White's, Bates's, or Ottesen's challenged failures were deliberately indifferent, rather than at most merely negligent. As discussed *supra*, proof of deliberate indifference requires a showing that an official was aware of facts from which she might infer a substantial risk of serious harm and that she actually drew the inference. *Reed*, 440 F. App'x at 343. Again, while deliberate indifference can be demonstrated by circumstantial evidence, it is an "extremely high standard" to meet, and allegations of inadequate, improper, and unsuccessful treatment alone generally do not suffice. *See Gobert*, 463 F.3d at 352; *see also Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (deliberate indifference not established where medical records indicate that the plaintiff was afforded extensive medical care by prison officials, and plaintiff's "history of complaints and the doctors' refusal to accommodate his requests in the manner he desired" did not change the result); *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) ("Deliberate indifference encompasses

only unnecessary and wanton infliction of pain repugnant to the conscience of mankind."); *Hare*, 74 F.3d at 645 (even "gross negligence" does not meet deliberate indifference standard); *Zaunbrecher,* 641 F. App'x at 348 (nurse supervisor's decision to continue course of treatment absent an in-person examination for inmate who was vomiting and ultimately died due to a bowel obstruction was relevant to whether she complied with an optimal standard of care but not whether she was deliberately indifferent); *Reed*, 440 F. App'x at 346 (nurse's failure to order transport to hospital immediately after receiving notice of elevated vital signs would be "in the category of malpractice, not deliberate indifference").

The Court concludes otherwise with respect to Bell, however. Taking the facts in the light most favorable to Plaintiffs permits a conclusion that, on the night before and morning of Cleveland's death, she acted with deliberate indifference to Cleveland's welfare. *McCormick*, 105 F.3d at 1061; *see also Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979) ("Both the severity of the apparent illness and the appellants' off-hand, callous comments with respect to Fielder's welfare belie the theory that they merely misdiagnosed a prisoner's sickness. There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help."). The PMS Defendants' invocation of qualified immunity does not warrant a different result: as the Court set forth in its previous order, detainees have a clearly established right not to have their serious medical needs met with deliberate indifference, and a reasonable official "could not believe that her actions comported with clearly established law while also believing that there is an excessive risk to the plaintiff and failing to adequately respond to that risk." *Cleveland*, 198 F. Supp. 3d at 745 (citations from and modifications made in *Cleveland* omitted).

For the foregoing reasons, the PMS Defendants' Motion is granted with respect to Plaintiffs' Section 1983 claims against White, Bates, and Ottesen but denied as to the Section 1983 claims against Bell.

### c. Section 1983 Claims against Williams, Camp, Turner, and Cage

The Sheriff Defendants argue that Williams, Camp, Turner and Cage were not deliberately indifferent to Cleveland's needs: these defendants did not observe blood in Cleveland's feces; Cleveland's defecation on himself and statement that he was too weak or tired to come to the bars did not put these defendants on notice of a serious medical need; and, when Camp and Cage notified the medical department of the situation, Bell told them that he was faking. Plaintiffs contend that even a layperson would perceive that Cleveland was in need of serious medical attention when he was found. They also argue that Bell did not "actually render a medical opinion" and did not even "lay her eyes on him" after being informed of the situation.

Plaintiffs have adequately demonstrated that a jury could find Williams, Camp, Turner, or Cage liable. There is evidence that at least some of these defendants were aware of a serious risk to Cleveland's health or safety: Camp received instructions to watch Cleveland closely and checked on him during the night to ensure that he was still alive, and Camp and Cage contacted the medical department to report Cleveland's status. (Doc. 119 at 24-25); *see also Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016) (knowledge could reasonably be inferred, notwithstanding detainee's statement that he was not considering suicide and officer's statement that she did not believe detainee to be suicidal, where officer refused to issue detainee certain hygiene items and informed her shift relief of need to "keep an eye out" for suspicious behavior). Moreover, drawing all inferences in Plaintiffs' favor, on the night prior to Cleveland's death, his symptoms decisively evolved from chronic and often latent to acute and obvious. On this record,

a reasonable jury might find that Williams, Camp, Turner, or Cage knew of a serious risk to Cleveland's health or safety. *See Hope*, 536 U.S. at 738; *Farmer*, 511 U.S. at 842.

The remaining question is whether any of these Defendants then responded to the risk to Cleveland with deliberate indifference. *See Farmer*, 511 U.S. at 844 (officials who actually knew of risk to inmate health or safety may be "found free from liability" if they "responded reasonably to the risk"). Certainly, a Defendant who entirely failed to respond to Cleveland's situation might be found liable. *See Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (no deliberate indifference where "corrections complaint appeals examiner" referred inmate's situation to medical providers, but "[p]erhaps it would be a different matter if [the examiner] had ignored [the inmate's] complaints entirely"). Additionally, a guard's reliance on the opinion of a medical professional may not forestall liability where it would be "evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment." *See Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002) (acknowledging that such situations are "unusual"); *see also Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("*[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner*, a non-medical prison official like Gooler will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." (emphasis added)). A jury could properly find that it was unreasonable for the responding Sheriff Defendants merely to report the situation to the medical staff, (Doc. 119-13 at 18), or rely on Bell's opinion, rendered without examining Cleveland, that he was "faking," (Doc. 119-17 at 14). *See Farmer*, 511 U.S. at 844; *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("[A] factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that

his response to the risk was inappropriate under the circumstances.").  As the Court previously discussed, qualified immunity does not alter this analysis.  *Cleveland*, 198 F. Supp. 3d at 745.

For the foregoing reasons, the Sheriff Defendants' Motion will be denied with respect to the Section 1983 claims against Williams, Camp, Turner, and Cage.

### d.   Section 1983 Claims against Grimes in his Individual Capacity

The Sheriff Defendants contend that Plaintiffs' episodic acts claims against Grimes in his individual capacity fail because Grimes was not "personally involved" in providing Cleveland with medical care, he did not have access to Cleveland's medical charts, he was not "responsible" for approving the use of a wheelchair, and he inquired about Cleveland's situation with PMS employees and relied on what they said.  Plaintiffs observe that Grimes received several calls from Cleveland's family members concerning Cleveland's condition, and that a jury could conclude that Grimes's "total reliance" on what PMS employees told him and insistence that medical issues were "not his jurisdiction" was unreasonable, particularly given that it did not "match up" with the "seriousness or nature of the information" that Grimes had received from Cleveland's family.

As the Fifth Circuit and courts within it have repeatedly observed, supervisory officials are generally entitled to refer particular medical matters to medical professionals and rely on their judgment.  *See Pilinski v. Goodwin*, 2015 WL 2250377, at *5 (W.D. La. May 12, 2015); *Vasquez v. Dretke*, 226 F. App'x 338, 340 (5th Cir. 2007) (warden and director of clinical services "were not deliberately indifferent" where they merely "deferred to the judgment of medical professionals by denying . . . dentures"); *Garza v. Chaney*, 2007 WL 4367882, at *6 (S.D. Tex. Dec. 13, 2007) (it was reasonable for assistant warden to rely on medical department to "handle" medical needs of inmates); *cf. Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) (supervisors were required to take "reasonable measures" to protect inmates, but they were not required to "intervene

personally" in response to every inmate letter, and it was reasonable for them to discharge their duty by "referring the matter for further investigation or taking further administrative steps"); *Jones v. Livingston*, 2005 WL 3618316, at *3 (S.D. Tex. Jan. 6, 2005) (citing *Johnson v. Johnson* in ruling that it was reasonable for warden to refer medical matter to a doctor and rely on doctor's medical decisions); *Cox v. Irby*, 281 F. App'x 390, 391 (5th Cir. 2008) (plaintiff argued that warden violated his constitutional rights because she knew of his needs for medication and a wheelchair and had control over prison medical department; while plaintiff may have put warden "on notice" that his needs were not being met, he did not show that warden was "personally involved" in his medical care or that there was a causal connection between her conduct and alleged harm); *Jones v. St. Tammany Par. Jail*, 4 F. Supp. 2d 606, 612 (E.D. La. 1998) (supervisor's actions were objectively reasonable where he relayed detainee's request for a wheelchair to medical personnel and told detainee that obtaining a wheelchair "depended on the medical personnel's assessment of his need for it"). While the consequences of Grimes's reliance in this case may have been particularly severe, Plaintiffs have made no showing that would except this case from the application of these principles. Particularly, there is a paucity of evidence that, at the time of Cleveland's family's complaints, Grimes, a layperson, should have recognized that Cleveland was in need of medical care beyond that provided by medical staff. *See Bond*, 228 F. Supp. 2d at 920.

Therefore, the Sheriff Defendants' Motion will be granted with respect to Plaintiffs' individual capacity Section 1983 claims against Grimes.

### e. Official Capacity Claims

As Plaintiffs clarified in their Opposition to the Sheriff Defendants' Motion, their official capacity claims against Grimes and Gautreaux challenge (1) EBRPP's policy of "abdicating" the

Sheriff's duty to ensure adequate healthcare by deferring entirely to PMS, and (2) the conditions of confinement at EBRPP facing inmates with chronic conditions. The Sheriff Defendants argue that Plaintiffs' claims implicate the actions of individuals and do not show a "systematic failure" at EBRPP. Additionally, the Sheriff Defendants argue that Plaintiffs' claims are based on unstated or *de facto* policies, but Plaintiffs have made only general, conclusory allegations in support of the existence of such policies and how they caused the violation of Cleveland's constitutional rights. Moreover, the Sheriff Defendants argue that these allegations are belied by testimony concerning procedures actually in place at EBRPP. Plaintiffs argue that their claims are substantiated by HMA's report and by the testimony of several Sheriff Defendants that they believed their duties concerning any medical matter were complete upon referring it to PMS.

As the Court noted previously, *Monell* liability requires proof of four elements: (1) a policymaker; (2) an official policy; (3) a constitutional violation; and (4) a violation of that constitutional right whose "moving force" is "the policy or custom." *Piotrowski,* 237 F.3d at 578. That is, to succeed in holding a municipality liable in an "individual or episodic acts" case, the plaintiff must demonstrate "a municipal employee's subjective indifference and additionally that the municipal employee's act 'resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights.'" *Olabisiomotosho*, 185 F.3d at 526 (quoting *Hare*, 74 F.3d at 649 n.4); *see also id.* at 529 (city was not liable where the plaintiff failed to state a § 1983 claim against any of its officers).

To maintain a conditions-of-confinement claim, a plaintiff must show (1) a condition of a pretrial detainee's confinement that is (2) not reasonably related to a legitimate governmental interest and that (3) violated that detainee's constitutional rights. *See Edler v. Hockley Cty. Comm'rs Court,* 589 F. App'x. 664, 668 (5th Cir. 2014). A "condition of confinement" can be a

rule, restriction, practice, or general condition of pretrial confinement. *Id.*; *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997). "If the plaintiff seeks to base his or her constitutional claim on an *unstated* rule or policy, however, the plaintiff must show that one or more jail officials' acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." *Nagle,* 2016 WL 768588, at *9 (emphasis in original). For purposes of such a claim, a plaintiff need not show deliberate indifference on the part of the municipality. *See Duvall,* 631 F.3d at 207 ("[A] plaintiff must show deliberate indifference on the part of the municipality only in a case in which the constitutional violation resulted from an episodic act or omission of a state actor."). The two standards are similar and frequently overlap. *See Colbert v. City of Baton Rouge/Parish of East Baton Rouge*, 2018 WL 2224062, at *6 (M.D. La. May 15, 2018) ("Because of Plaintiffs' failure to plausibly plead *Monell* liability, Plaintiffs are unable to satisfy the pleading requirements of the conditions of confinement theory."); *Duvall*, 631 F.3d at 208 ("The jury found that Duvall's injury was caused by a policy or custom of the County. Although the jury found this fact in response to the court's instruction on municipal liability under the *Monell* test, the jury's finding satisfies the need for such a showing in connection with the underlying [conditions-of-confinement] constitutional violation as well. . . . We see no meaningful difference between these showings. . . . [W]e are convinced that the jury's finding of a custom or policy under the municipal-liability jury instruction satisfies the custom-or-policy element for purposes of the underlying constitutional violation.").

In *Shepherd v. Dallas County*, the Fifth Circuit reviewed an appeal from a jury verdict in a detainee's favor, evaluating a county's argument that certain claims were episodic-acts-or-omissions claims concerning "specific acts of specific County employees," rather than conditions-

of-confinement claims challenging "County policy." 591 F.3d 445, 452-53 (5th Cir. 2009). The Fifth Circuit ruled that *Shepherd* was "the rare case in which a plaintiff demonstrated deficiencies in the conditions of confinement that amounted to punishment before he was adjudged guilty[.]" *Id.* at 449. The Fifth Circuit described the nearly four months of the plaintiff's detention, including repeated requests by the plaintiff and his family members for hypertension medication, very limited treatment, and several "hypertensive emergencies" ultimately culminating in a debilitating stroke. *Id.* at 449-50. The Fifth Circuit also noted that the plaintiff had provided "extensive evidence on the jail's treatment of inmates with chronic illness," including an HMA report like the one in this case. *Id.* at 450-51. The Fifth Circuit opined:

> Shepherd's claim . . . does not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness. His original complaint contains the full theory of the case: The jail's evaluation, monitoring, and treatment of inmates with chronic illness was, at the time of Shepherd's stroke, grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel, and these deficiencies caused his injury. Shepherd relied on evidence showing that the inadequate treatment he received in a series of interactions with the jail's medical system inevitably led to his suffering a stroke. To demonstrate the existence of an unlawful condition, he presented extensive independent evidence on the jail's treatment of inmates with chronic illness. This evidence included a comprehensive evaluative report [by HMA] commissioned by the County, [a] DOJ report, affidavits from employees of the jail and its medical contractor attesting to the accuracy and applicability of the reports, and a plethora of additional documentary evidence. From this evidence, the court could reasonably infer a *de facto* jail policy of failing properly to treat inmates with chronic illness.

*Shepherd*, 591 F.3d at 453 (footnote omitted). The Fifth Circuit also ruled that the plaintiff had demonstrated that "serious injury and death were the inevitable results of the jail's gross inattention to the needs of inmates with chronic illness" and, in the absence of any legitimate penological or administrative goal, that inattention amounted to punishment. *Id.* at 454; *see also Reed*, 795 F.3d at 467, 469-70 (as in *Shepherd*, the plaintiffs alleged inadequate treatment "in a series of interactions with the jail's medical system," thereby making a conditions-of-confinement claim,

but, unlike in *Shepherd*, they presented evidence of only one death that took place in the jail four months prior).

In the course of its analysis, the *Shepherd* panel observed that the district court had dismissed the plaintiff's episodic acts claim because he had failed to "identify any jail employee who had shown deliberate indifference to his plight." *Shepherd*, 591 F.3d at 450. The Fifth Circuit upheld that ruling, observing that "no single individual's error actually caused the hypertensive decline into a stroke[.]" *Id.* at 453 n.2; *see also Sanchez v. Young Cty., Texas*, 866 F.3d 274, 281 (5th Cir. 2017) (upholding grant of summary judgment on episodic-acts-and-omissions claims but remanding for consideration of conditions-of-confinement claims). The *Shepherd* panel also approved of the district court considering the plaintiff's claims under both theories and permitting the one with evidentiary support to proceed. *Shepherd*, 591 F.3d at 452 n.1.

Preliminarily, the Sheriff of a parish has some obligation to provide medical treatment for those detained in a parish jail. *Landry v. E. Baton Rouge Par. Sheriff's Office*, 2014-0733 (La. App. 1 Cir. 3/9/15), *writ granted*, 2015-681 (La. 6/30/15), 168 So. 3d 378; *Oladipupo v. Austin*, 104 F. Supp. 2d 643, 653 (W.D. La. 2000) ("Sheriff Belt may be sued in his official capacity because under Louisiana law, administration of a parish jail, including the obligations to provide medical care for, feed and clothe the prisoners, is the province of the Sheriff of the parish."). The alleged separation of duties between PMS and the Sheriff's Office, by itself, does not defeat summary judgment on these claims.

Plaintiffs have expressly pled the claims addressed in this section as challenging overall conditions of confinement and/or a policy, not merely the acts of individual officials as alleged elsewhere in the Second Amended Complaint. The Court believes it appropriate to consider Plaintiffs' claims as pled rather than reject them, as the Sheriff Defendants suggest, because their

factual allegations are "of particular acts or omissions of specific individuals[.]" (Doc. 108-2 at 19). It was no obstacle to the conditions-of-confinement claims in *Shepherd* that the plaintiff also pled episodic-acts-or-omissions claims based on the same events, and this Court would certainly be permitted to analyze Plaintiffs' allegations under both standards and let the theory with evidentiary support proceed. *See Shepherd*, 591 F.3d at 452 n.1, 453 n.2.

Plaintiffs have adequately alleged and substantiated the possible existence of unconstitutional conditions of confinement concerning the treatment of chronic conditions. While Plaintiffs' showing is perhaps less robust than that set forth in *Shepherd*, Plaintiffs provide more than general and conclusory allegations in support of their claims, including the portions of the HMA report concerning staffing, access to care and medication, and guidelines for chronic care, as well as allegations in other cases concerning medical care at EBRPP. While it is true that the HMA report was assembled following Cleveland's death, the sometimes severe and pervasive deficiencies described in the report existed sufficiently near the time of Cleveland's death to permit a reasonable jury to infer that they had also existed at the time of Cleveland's death and were one cause of inadequate care and attention that he allegedly received. Such matters are more appropriately tested at trial than on summary judgment. The Court also does not believe it fatal that the Second Amended Complaint does not specifically list every event or document that Plaintiffs will rely on in support of their claims.

The alleged policy concerning reliance on PMS is on less solid ground, however. Its existence, extent, and effects have less evidentiary support than Plaintiffs' other official capacity claims and, as the Court discussed previously, the Constitution *generally* permits correctional staff to refer particular medical inquiries to medical professionals and rely on their judgment. *Pilinski*,

2015 WL 2250377, at *5; *Vasquez*, 226 F. App'x at 340; *Bond*, 228 F. Supp. 2d at 920; *Spruill*, 372 F.3d at 236.

For the foregoing reasons, the Sheriff Defendants' Motion will be granted with respect to Plaintiffs' official capacity claims concerning officers' reliance on PMS but denied with respect to their official capacity claims concerning general conditions of confinement facing detainees with chronic conditions.

### f. ADA Claims

The Sheriff Defendants argue that Plaintiffs' ADA claims against Gautreaux and Grimes are subject to dismissal because PMS provides healthcare at EBRPP and Gautreaux, Grimes, and their employees therefore could not have discriminated against or denied services to Cleveland. The PMS Defendants argue that Plaintiffs' ADA claim against PMS fails because it made "every reasonable accommodation to [Cleveland's] alleged disability," as he did not need a wheelchair and he had access to his medication. Plaintiffs contend that Cleveland was disabled; both prison officers and medical staff knew of his disability and refused to provide him with a wheelchair, causing him unnecessary pain and limiting his access to his medication; and EBRPP had few or no policies or procedures in place to comply with the ADA.

As this Court previously discussed, a defendant's failure to make reasonable modifications necessary to adjust to the unique needs of disabled persons can constitute intentional discrimination under the ADA, as failure to accommodate may cause a prisoner to suffer more pain and punishment than a non-disabled prisoner. *Cleveland*, 198 F. Supp. 3d at 746; *see also Hacker*, 2016 WL 3167176, at *13 ("intentional discrimination" under ADA does not require a showing of "personal animosity or ill will"); *cf. Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004) ("If the ADA requires reasonable modification of DART's paratransit

plan, the Meltons may have stated a prima facie case of discrimination and in which case we assume that summary judgment in favor of DART would be inappropriate."). A disabled person's failure to expressly "request" an accommodation is not fatal to an ADA claim where the defendant otherwise had knowledge of the individual's disability and needs but took no action. *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 296 (5th Cir. 2012) (further stating that a "balance" must be struck between a disabled individual's need to request accommodations when limitations are not obvious or apparent and a public entity's duty to provide accommodations without further notice).

Plaintiffs have set forth evidence from which a jury could find satisfied the elements of an ADA claim as set forth *supra*. *See* 42 U.S.C. § 12102(1)(A); *Greer*, 472 F. App'x at 296; *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008). Concluding otherwise would require the Court to decide disputed factual issues in Defendants' favor, which the Court cannot do at this stage. The Court also concludes that the ADA claims against the Sheriff Defendants should persist, as the Sheriff's Office has some responsibility for the overall provision of medical care at EBRPP. *See supra*; *see also Bailey v. E.B.R. Par. Prison*, 2014 WL 1404574, at *4 (M.D. La. Apr. 10, 2014) (governing authority of East Baton Rouge Parish is responsible for funding the medical needs of prisoners confined at EBRPP, while the Sheriff's Office is responsible for overseeing or supervising the manner in which such medical care is provided).

### g. State Law Claims

Plaintiffs' state law claims assert that the Sheriff Defendants negligently: (1) refused to permit Cleveland to use a wheelchair; (2) violated their own policies and procedures concerning access to medical services; (3) failed to respond to Cleveland's family's calls about his health; (4) failed to have in place adequate protocols or facilities for the treatment of inmates with life-

threatening illnesses; (5) failed to provide adequate hospital access; (6) failed to transport Cleveland to a hospital when he was having chest pain and "heart attack symptoms"; (7) failed to provide access to medical care while Cleveland was having a "heart attack" and assigned him to a solitary cell for his safety; and (8) failed to provide access to medical care when it was "obvious" that Cleveland was having a medical emergency. (Doc. 87 at 21-22).

The Sheriff Defendants' Motion contends that these claims fail because none of these Defendants had the "authority" to approve the issuance of a wheelchair, Cleveland "clearly had access to medical services," Grimes responded appropriately to calls from Cleveland's family members, there were procedures in place concerning hospital referrals, Cleveland was seen by PMS employees for heart attack symptoms and was assigned to a solitary cell by Bates (not a Sheriff Defendant), and the Sheriff Defendants responded properly to him defecating on himself.

The Court has addressed similar constitutional claims *supra*, and the "extremely high" deliberate indifference standard and subjective mental state applied to those claims does not apply to Plaintiffs' state law claims. *See Breach v. Copes*, 2007-0917, 2007 WL 4327842 (La. App. 3 Cir. 12/12/07) ("Under Louisiana law prison authorities owe a duty to provide inmates with reasonable medical care. However, unlike federal jurisprudence, there is no superimposed element in that duty that the conduct amount to something more than negligence." (citation omitted)). Notably absent from this portion of the Motion is any case law describing the duties and standards of care applicable to any of Plaintiffs' state law claims as distinct from Plaintiffs' federal claims. (*See* Doc. 108-2 at 40-43).

On the current record, the Court cannot find as a matter of law that the Sheriff Defendants were not negligent. Again, the Sheriff Defendants generally ask the Court to resolve disputed factual issues or to determine as a matter of law whether Cleveland's medical care was reasonable

or adequate, which is generally inappropriate at this stage. Additionally, as discussed previously, both Gautreaux and Grimes have some responsibility for overseeing the provision of medical care at EBRPP, such that state law claims may lie against them vicariously. *See, e.g., Cobb v. Jones*, 2015 WL 5794027, at \*9 (W.D. La. Oct. 2, 2015) ("Unlike its federal counterparts, Plaintiff's Louisiana law claims provide for an imposition of liability upon Deputy Sers' employer, Sheriff Jones, via the theory of respondeat superior.").

## VI. CONCLUSION

Accordingly, **IT IS ORDERED** that Bridges's Motion, (Doc. 104), is **GRANTED**, and all of Plaintiffs' claims against Bridges are **DISMISSED WITH PREJUDICE**.

It is **FURTHER ORDERED** that the PMS Defendants' Motion, (Doc. 105), is **DENIED** with respect to Plaintiffs' claims against Bell under Section 1983 and against PMS under the ADA. The Motion is **GRANTED** in all other respects, and all of Plaintiffs' claims against Ottesen, Antoine, White, and Bates are **DISMISSED WITH PREJUDICE**.

It is **FURTHER ORDERED** that the Sheriff Defendants' Motion, (Doc. 108), is **GRANTED** with respect to Plaintiffs' Section 1983 claims against Grimes in his individual capacity and Gautreaux in his individual capacity. This Motion is also **GRANTED** with respect to Plaintiffs' Section 1983 official capacity claims concerning officers' reliance on PMS. This Motion is **DENIED** in all other respects.

Signed in Baton Rouge, Louisiana, on <u>August 17, 2018</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**